# EXHIBIT B



**EXMO. SR. DR. JUIZ DE DIREITO DA ___ VARA DE DIREITO EMPRESARIAL E ARBITRAGEM DO FORO CENTRAL DA COMARCA DA CAPITAL DO ESTADO DE SÃO PAULO**


**BYTEDANCE LTD.**, sociedade estrangeira, com endereço em PO Box 309, Ugland House, Grand Cayman, KY1-1104 Ilhas Cayman, **BYTEDANCE TECHNOLOGY LTD.**, sociedade estrangeira, com endereço em P.O. Box 31119 Grand Pavilion, Hibiscus Way, 802 West Bay Road, Grand Cayman, KY1 – 1205, Ilhas Cayman, **TIKTOK PTE. LTD.**, sociedade estrangeira, endereço em 1 Raffles Quay, #26-10, 048583, Singapura, e **BYTEDANCE BRASIL TECNOLOGIA LTDA.**, sociedade limitada, inscrita no CNPJ/ME sob o nº 27.415.911/0001-36, com endereço na Avenida Presidente Juscelino Kubitschek, 1909, 24º andar, Conj. 241, Vila Nova Conceição, Cidade de São Paulo, Estado de São Paulo, CEP 04543-907 ("**BYTEDANCE**" ou "**Autoras**"), vêm, por seus advogados, que receberão intimações na Av. Brigadeiro Faria Lima, 4221, 3º andar, Itaim Bibi, CEP 04538-133, São Paulo/SP, e no endereço eletrônico intimacoesrj@dsadvogados.com.br (**Doc. 01**), com fulcro nos artigos 19, inciso I, 20, 319 e seguintes do CPC, e 187 do Código Civil, ajuizar a presente


**AÇÃO DECLARATÓRIA, COM PEDIDO DE TUTELA ESPECÍFICA DE OBRIGAÇÕES DE FAZER E NÃO FAZER**


contra **VELOS MEDIA INTERNATIONAL LIMITED**, pessoa jurídica irlandesa, com endereço em Unit 32, The Hyde Building, The Park, Carrickmines, Dublin, Irlanda 18, **VELOS MEDIA LLC**, sociedade norte-americana, com endereço em 4143 Maple Ave Ste 130, 75219-3288, Dallas, Texas, Estados Unidos da América, e **TECHSTREAM LLC**, sociedade norte-americana, com endereço em 4143 Maple Ave Ste 130, 75219-3288, Dallas, Texas, Estados Unidos da América (em conjunto "**VELOS**" ou "**Rés**" – **Doc. 02**), com base nos fatos e fundamentos que passa a aduzir.

Rio de Janeiro
Av. Rodolfo Amoedo, 300
Barra da Tijuca
22620-350

+55 21 2237 8700

São Paulo
Av. Brigadeiro Faria Lima,
4221, 3º andar
Itaim Bibi
04538-133

+55 11 2155 9500

Brasília
SHS, Quadra 06, Conjunto A,
Bloco E - Salas 1512 e 1513
Asa Sul
70316-902

+55 61 3433 6694

dannemann.com.br

**DANNEMANN**
**SIEMSEN**

## I – <u>OBJETO DA PRESENTE AÇÃO DECLARATÓRIA</u>.

1.  A presente ação tem como objetivo a obtenção de uma declaração judicial de que as patentes BR122019021946-0, BR102012027259-8, BR102012027968-1, PI0813904-0, BR102013001517-2, BR102013001124-0, BR112013007383-7, BR102012029413-3, BR112014011334-3 e BR112014025292-0, de titularidade da VELOS, não são essenciais a qualquer padrão de codificação de vídeo estabelecido pelo ITU-T, incluindo o padrão H.265/HEVC e que não há infração dessas patentes pela BYTEDANCE ou seus parceiros comerciais, devendo a VELOS ser condenada a abster-se de tomar quaisquer medidas inibitórias/excludentes contra a BYTEDANCE e seus parceiros comerciais com base em tais tecnologias. Na medida em que funcionalidades relevantes do padrão H.266/VVC são implementadas substancialmente da mesma forma que o padrão H.265/HEV, quaisquer patentes que não sejam essenciais ao H.265/HEVC também não o serão ao H.266/VVC, substancialmente pelas razões acima expostas.

2.  As Autoras também buscam a declaração judicial de que, na medida em que este d. juízo entenda que qualquer das patentes aqui discutidas seria essencial ao padrão H.265/HEVC (ou ao padrão relacionado H.266/VVC), a VELOS deverá conceder uma licença do seu portfólio de patentes essenciais à BYTEDANCE (o que engloba seus parceiros comerciais) em termos FRAND[1], permitindo a implementação dos padrões pela BYTEDANCE, conforme o compromisso irrevogável da VELOS perante a *International Telecommunications Union* – ITU. A VELOS deverá, por consequência, nos termos dos artigos 497 e seguintes do Código de Processo Civil, ser condenada a conceder as referidas licenças em termos FRAND para as respectivas patentes vigentes em território nacional e com amplitude sobre o território brasileiro.

3.  A presente ação visa, ainda, a declarar que a adoção pela VELOS de medidas, extrajudiciais ou judiciais, no Brasil com o intuito de inibir e excluir do uso de suas

---

[1] Acrônimo em inglês para *fair, reasonable and non-discriminatory* (termos justos, razoáveis e não-discriminatórios). Embora a ITU utilize apenas a sigla RAND, a BYTEDANCE também busca, de acordo com o entendimento do CADE e a nomenclatura comumente utilizada para esse tipo de licença no Brasil, uma licença justa para as patentes da VELOS.

**DANNEMANN**
**SIEMSEN**

patentes alegadas como essenciais ao padrão de codificação de vídeo H.265/HEVC (ou qualquer padrão relacionado, incluindo o padrão H.266/VVC), sem antes se envolver em negociações razoáveis, extrajudiciais ou judiciais, acerca do valor dos *royalties* de licenciamento em termos FRAND, constitui ato abusivo e contrário ao princípio da boa-fé objetiva e ao ordenamento pátrio, que não pode ser tolerado ou dotado de qualquer eficácia, devendo, em consequência, a VELOS ser condenada a abster-se de tomar medidas inibitórias/excludentes, de qualquer natureza, nessas condições contra a BYTEDANCE e/ou seus parceiros comerciais.

4. O fato de a VELOS ter ajuizado uma ação judicial contra a BYTEDANCE nos Estados Unidos, medida que geralmente precede ações judiciais no Brasil com pedidos liminares, reforça a necessidade de a BYTEDANCE propor a presente demanda para se proteger perante a jurisdição brasileira.

5. Aliás, o uso de ameaças por liminares excludentes como forma de coação negocial relativa a patentes alegadamente essenciais a padrões tecnológicos (*Standard Essential Patents* – SEP) já foi rechaçado pelo c. Superior Tribunal de Justiça[2] e pelo CADE[3], além de ser reiteradamente contestado por Tribunais internacionais, como recentemente ocorreu na Corte de Apelações do Reino Unido em caso análogo.

6. A BYTEDANCE pretende de boa-fé resolver a questão de forma integral, buscando a chamada "*patent peace*"[4], encerrando qualquer incerteza legal ou comercial sem a necessidade de medidas gravosas, como medidas liminares fragmentadas por infrações de patentes específicas alegadamente essenciais.

## II – COMPETÊNCIA DESTE R. JUÍZO PARA PROCESSAR E JULGAR A PRESENTE DEMANDA.

---

[2] STJ – AgInt na petição nº 15.420 – Relator Exmo. Sr. Ministro Antonio Carlos Ferreira.
[3] CADE, Voto do Conselheiro Gustavo Augusto no Recurso Voluntário nº 08700.010219/2024-17.
[4] A chamada "*patent peace*" se refere ao estado de equilíbrio que as partes buscam alcançar em um contexto de litígios e negociações de licenciamento de patentes, no qual cessam as disputas judiciais e estabelecem condições estáveis para o uso das tecnologias. Trata-se de um mecanismo de pacificação que permite que titulares e potenciais licenciados concentrem seus esforços na exploração econômica da tecnologia, em vez de manterem ciclos contínuos de litígios.

dannemann.com.br

**DANNEMANN**
**SIEMSEN**

7.  Considerando que os direitos de propriedade industrial são considerados bens móveis para os efeitos legais (artigo 5°[5] da Lei n° 9.279/1996 – Lei da Propriedade Industrial – LPI), é competente o foro de domicílio do réu, nos termos do artigo 46, *caput*[6], do CPC, ou em caso de réu que não tiver domicílio no Brasil, o foro de domicílio do Autor, nos termos do artigo 46, §3°, do CPC[7].

8.  Considerando que as Rés são sociedades estrangeiras sediadas na Irlanda e nos Estados Unidos, aplica-se a exceção prevista no parágrafo terceiro do artigo 46[8], sendo o presente foro competente para julgar esta ação. Afinal, entre as Autoras estão empresas com sede nas Ilhas Cayman e Singapura, além da empresa brasileira, **sediada nesta cidade de São Paulo/SP**.

9.  Ainda, tratando-se de ação que discute direitos de propriedade industrial, deve ser distribuída a uma das Varas Empresariais, pela especialização na matéria.

### III – <u>AS PARTES DA PRESENTE AÇÃO: ENQUANTO A BYTEDANCE É RESPONSÁVEL POR UMA DAS REDES SOCIAIS MAIS UTILIZADAS NO BRASIL, A VELOS É EMPRESA ESTRANGEIRA QUE SEQUER OPERA OU GERA EMPREGOS NO PAÍS.</u>

10. As Autoras serão doravante referidas em conjunto como "BYTEDANCE", mas desempenham funções distintas. Por exemplo, a BYTEDANCE LTD. é a sociedade mãe de todas as sociedades BYTEDANCE, enquanto a TIKTOK PTE. LTD. é uma provedora de plataforma no Brasil e a BYTEDANCE BRASIL é responsável pelas vendas e *marketing* locais. A BYTEDANCE é responsável pela plataforma de vídeos online TikTok, um verdadeiro fenômeno de popularidade entre a população brasileira, contando com mais de 124 milhões de usuários no país, segundo dados

---

[5] "Art. 5° Consideram-se bens móveis, para os efeitos legais, os direitos de propriedade industrial."
[6] "Art. 46. A ação fundada em direito pessoal ou em direito real sobre bens móveis será proposta, em regra, no foro de domicílio do réu."
[7] "Art. 46. § 3° Quando o réu não tiver domicílio ou residência no Brasil, a ação será proposta no foro de domicílio do autor, e, se este também residir fora do Brasil, a ação será proposta em qualquer foro."
[8] "*Vale lembrar a redação do art. 46, § 3°,do CPC, no sentido de que, quando o réu não tiver domicílio ou residência no Brasil, a ação será proposta no foro de domicílio do autor, e, se este também residir fora do Brasil, a ação será proposta em qualquer foro.*" (STJ, AREsp n. 2.443.415, Ministro Antonio Carlos Ferreira, DJe de 16/02/2024.)

**DANNEMANN**
**SIEMSEN**

extraídos do site data.ia.com, especializado no levantamento de dados no mundo digital:

| Unified App | | Active Users ⇕ |
|---|---|---|
| YouTube — Google | | 174m  ^442k |
| Instagram — Instagram | | 167m  ^471k |
| Facebook — Meta | | 135m  ^684k |
| TikTok — ByteDance | | 124m  ^977k |

11. O aplicativo conquistou o coração dos brasileiros fornecendo conteúdo rápido, chamativo e altamente personalizado, que conecta facilmente criadores de conteúdo e usuários em torno de tendências culturais locais.

12. O aplicativo é um verdadeiro fenômeno cultural, influenciando comportamentos, tendências e formas de consumo de conteúdo em todas as faixas etárias. Também tem forte presença de algumas das personalidades mais famosas do Brasil, como o jogador do futebol Vinícius Junior, com mais de vinte nove milhões de seguidores, e a *influencer* Virgínia Fonseca, que conta com mais de **quarenta milhões de seguidores em seu perfil**:



**DANNEMANN**
**SIEMSEN**

13. A simbiose entre a BYTEDANCE e o Brasil é também refletida nos investimentos que a empresa realiza no país, estimulando a inovação, economia e gerando empregos. A BYTEDANCE iniciará a construção de um *datacenter* na cidade de Caucaia no Ceará em mais um passo que representa a importância do país para empresa e vice-versa.

14. A VELOS, por sua vez, é uma empresa estrangeira, com sociedades sediadas na Irlanda e nos Estados Unidos, que não desenvolve atividade empresarial no Brasil, não produz renda, aparecendo no país meramente para obter lucro por meio de licença de suas patentes, sem gerar riqueza ou empregos diretos no país.

15. A VELOS MEDIA INTERNATIONAL LIMITED é a titular das patentes ora *sub judice*, a VELOS MEDIA LLC é a autora da ação de infração de patente ajuizada contra a BYTEDANCE nos Estados Unidos, e ambas são afiliadas da TECHSTREAM LLC, a terceira Ré. Por isso, as Autoras requerem a citação das Rés no endereço do representante legal da VELOS MEDIA INTERNATIONAL LIMITED, com poderes para receber citação no Brasil, na forma do artigo 217 da LPI.

16. É nesse contexto que a presente ação se insere: a proteção de empresas com forte atuação e reconhecimento no Brasil contra uma empresa que pode buscar, através do uso abusivo de suas patentes brasileiras, paralisar as atividades e manchar a imagem da BYTEDANCE perante este público, bem como coagir as Autoras em busca de *royalties* supra-FRAND – *i.e.*, valores acima daquilo considerado justo, razoável e não discriminatório.

## IV – REGULAR CABIMENTO DESTA AÇÃO DECLARATÓRIA: A BUSCA PELO JUDICIÁRIO SE JUSTIFICA PARA NEUTRALIZAR A INSEGURANÇA JURÍDICA CAUSADA PELO COMPORTAMENTO ABUSIVO DA VELOS.

17. O cabimento desta ação tem fulcro no artigo 19, inciso I, do CPC, que admite o ajuizamento de ação declaratória para elucidar situação jurídica antes que haja lesão. A presente ação tem cabimento por ser um meio preventivo legítimo de proteção contra o uso abusivo e estratégico do sistema judicial brasileiro por parte

6



da VELOS na qualidade de titular de patentes SEP, como vem sendo praxe por diversas empresas como a VELOS.

18. Antes mesmo de enviar qualquer proposta de licenciamento, em termos FRAND ou não, a VELOS já acionou a BYTEDANCE no Tribunal do Oeste do Texas, Estados Unidos, com infundadas alegações de violação de suas patentes norte-americanas (**Doc. 03**), o que demonstra a sua real intenção em ações como essa: pressionar a implementadora – *i.e.*, a BYTEDANCE – a aceitar termos draconianos no licenciamento de suas patentes que alega serem SEPs.

19. Entretanto, VELOS nunca ofereceu qualquer proposta FRAND à BYTEDANCE. Nesse sentido, as Autoras destacam trecho de sua defesa naquela ação norte-americana justamente demonstrando a fragilidade dos argumentos da VELOS (**Doc. 04**):

> *"Velos has not made any offer for a license to its allegedly standard-essential patents, including the Asserted Patents, on RAND terms and conditions. Indeed, Velos has not made any license offer to the TikTok Counterclaim Plaintiffs at all. Velos violated its contractual obligation to license on RAND terms patents that it contends is essential to implement the H.265 Standard, effectively depriving the TikTok Counterclaim Plaintiffs of their rights as third-party beneficiaries to a license on RAND terms for patents Velos contends are essential to implement that standard."*

> **Tradução Livre:**

> *"A Velos não fez qualquer oferta de licenciamento para suas patentes supostamente essenciais ao padrão, incluindo as Patentes Reivindicadas, nos termos e condições RAND. Na verdade, a Velos não fez qualquer oferta de licenciamento às Autoras da Reconvenção, TikTok. A Velos violou sua obrigação contratual de licenciar, nos termos RAND, as patentes que alega serem essenciais para implementar o Padrão H.265, privando efetivamente as Autoras da Reconvenção, TikTok, de seus direitos como terceiros beneficiários de uma licença nos termos RAND para as patentes que a Velos alega serem essenciais para implementar esse padrão."*

20. A alegação contida na petição inicial daquela ação, de que a BYTEDANCE teria de alguma forma atrasado a discussão sobre a assinatura de um NDA (*Non Disclosure Agreement* – Acordo de Confidencialidade), também não permite a conclusão de que a VELOS teria interesse em licenciar o seu portfólio de patentes alegadamente



essenciais em termos FRAND. A literatura sobre o tema, a partir de decisão da Corte de Dusseldorf, na Alemanha, indica que se "(...) *as partes não chegarem a um acordo sobre os termos e condições de um NDA, ou se o implementador rejeitar tal acordo por completo, o implementador não pode ser considerado como não estando disposto a licenciar com base apenas nesses fatos*."[9]

21. O compromisso FRAND para as patentes que a VELOS agora possui foi assumido pela própria VELOS perante os órgãos de definições de padrões (*Standard-Setting Organizations* – SSOs), como é o caso da ITU, em uma declaração geral que a VELOS submeteu em que claramente afirma que licenciará suas patentes em termos justos, razoáveis e não discriminatórios (**Doc. 05**):



**Tradução Livre**: "*O Titular da Patente está pronto para conceder uma licença a um número ilimitado de requerentes em uma base global e não discriminatória e em termos e condições razoáveis para fazer, usar e vender as implementações dos documentos acima*"

22. O compromisso também decorre das declarações feitas pelos titulares anteriores das patentes que a VELOS agora possui, incluindo ao menos RESEARCH IN MOTION LTD., BLACKBERRY LTD., e SHARP CORPORATION (**Doc. 06**). As declarações de Propriedade Intelectual destas empresas repetidamente indicam que, se qualquer das suas patentes for essencial aos respectivos padrões tecnológicos, licenciará em termos FRAND, discutidos em mais detalhes abaixo. E ao falhar em sequer apresentar uma proposta de licenciamento à BYTEDANCE, a VELOS violou tal compromisso, que acompanha as patentes que adquiriu da antiga proprietária (obrigação *propter rem*), conforme a própria política de transferência/cessão da declaração de essencialidade:

---

[9] Tradução livre do trecho "If the parties cannot agree on an NDA's terms and conditions, or if the implementer rejects such an agreement altogether, the implementer cannot be regarded as being unwilling to license based on those facts alone.", retirado do texto "Conflicting interests: refusing NDAs in FRAND negotiations" de Matthias Sonntag e Herwig Lux. Disponível em: https://www.lexology.com/library/detail.aspx?g=93bf1222-72b7-4185-9126-7ae0c7672338.

dannemann.com.br



> Assignment/transfer of Patent rights: Licensing declarations made pursuant to Clause 2.1 or 2.2 of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC shall be interpreted as encumbrances that bind all successors-in-interest as to the transferred Patents. Recognizing that this interpretation may not apply in all jurisdictions, any Patent Holder who has submitted a licensing declaration according to the Common Patent Policy - be it selected as option 1 or 2 on the Patent Declaration form - who transfers ownership of a Patent that is subject to such licensing declaration shall include appropriate provisions in the relevant transfer documents to ensure that, as to such transferred Patent, the licensing declaration is binding on the transferee and that the transferee will similarly include appropriate provisions in the event of future transfers with the goal of binding all successors-in-interest.

**Tradução Livre**: "*Cessão/transferência de direitos de patente*: Declarações de licenciamento feitas nos termos da Cláusula 2.1 ou 2.2 da Política Comum de Patentes para ITU-T/ITU-R/ISO/IEC devem ser interpretadas como ônus que vinculam todos os sucessores legais em relação às Patentes transferidas. Reconhecendo que essa interpretação pode não se aplicar em todas as jurisdições, qualquer Titular de Patente que tenha apresentado uma declaração de licenciamento de acordo com a Política Comum de Patentes — seja pela seleção da opção 1 ou 2 no formulário de Declaração de Patente — que transfira a titularidade de uma Patente sujeita a tal declaração de licenciamento deverá incluir disposições adequadas nos documentos de transferência relevantes para garantir que, em relação a essa Patente transferida, a declaração de licenciamento seja vinculante ao cessionário, e que o cessionário inclua, de forma semelhante, disposições adequadas em eventuais transferências futuras com o objetivo de vincular todos os sucessores legais.*"

23. A intenção da VELOS ao ajuizar a referida ação norte-americana é clara: prejudicar a imagem da BYTEDANCE, ré daquela ação e licenciante de boa-fé ("*willing licensee*"), usando aquela investida como instrumento de coação, retratando empresas que têm reputação internacional como infratoras de patentes – tudo em violação de sua obrigação de negociar de boa-fé o licenciamento em termos FRAND de suas patentes que alega serem essenciais a padrões tecnológicos.

24. O ajuizamento da presente ação declaratória no Poder Judiciário brasileiro, além da ameaça já consolidada contra a BYTEDANCE decorrente do ajuizamento da ação de infração das patentes norte-americanas das ora Rés, leva em conta ainda a recente atuação de tantas outras empresas como a VELOS em território nacional. Essas empresas ajuízam ações análogas à ajuizada pela VELOS mundo afora e também recorrem ao Brasil, que se tornou um polo relevante para discussões sobre patentes SEP – o que reforça a ameaça da VELOS contra a BYTEDANCE.

25. Para se ter uma dimensão geral da amplitude que tomaram esses litígios predatórios e abusivos no Brasil, apenas nos últimos cinco anos, outras titulares de patentes alegadamente essenciais, como a VELOS, **já ajuizaram mais de <u>quarenta e cinco</u> ações inibitórias e indenizatórias com graves pedidos de tutela de urgência no Brasil** visando a coagir empresas efetivamente atuantes no território nacional a

dannemann.com.br

**DANNEMANN SIEMSEN**

cederem a termos abusivos supra-FRAND para o licenciamento de seus portfólios de patentes essenciais.

26. Dentre essas inúmeras ações, destaca-se que **dezessete** foram ajuizadas por empresas que fazem parte do *patent pool* AVANCI VIDEO[10] em conjunto com as Rés, como a ERICSSON – o que tornam ainda mais fortes os indícios de que a VELOS poderá adotar esta mesma postura. Aliás, o ajuizamento da ação da VELOS nos Estados Unidos é um forte indício de que o mais provável próximo passo das Rés será ajuizar uma ação análoga no Brasil, e é contra esse cenário que as ora Autoras visam se resguardar por meio da presente ação declaratória.

**Lista de licenciantes do AVANCI VIDEO disponível em https://www.avanci.com/video/.**



27. A estratégia dessas empresas segue sempre a mesma linha: enquanto negociam os termos do licenciamento de seus portfólios com as empresas interessadas em obter o licenciamento, sem entrar em negociações razoáveis ou buscar a determinação

---

[10] Patent pools são arranjos colaborativos em que dois ou mais titulares de patentes concordam em licenciar conjuntamente um conjunto de tecnologias relacionadas, geralmente essenciais para um determinado padrão tecnológico como os já mencionados AVC e HEVC. Nessas estruturas, as patentes são agrupadas e disponibilizadas por meio de um único mecanismo de licenciamento, o que reduz custos de transação. Especificamente em relação ao AVANCI VIDEO, ela se descreve como uma "*plataforma de licenciamento que reúne patentes essenciais para vários padrões de vídeo e pertencentes a diversos licenciadores em uma única licença disponível para empresas de streaming na Internet*". Tradução livre de trecho retirado do site da AVANCI VIDEO, disponível em: https://www.avanci.com/video/.

dannemann.com.br

**DANNEMANN**
**SIEMSEN**

judicial ou extrajudicial de *royalties* FRAND, em manifesto comportamento contraditório, ajuízam ações inibitórias no Rio de Janeiro, onde nenhuma das empresas envolvidas tem sede.

28. Trata-se de evidente violação da boa-fé objetiva cominada com prática de *forum shopping*. Narram que suas patentes reivindicadas seriam essenciais a padrões tecnológicos e, fazendo uso desse atalho probatório que vincula o uso do padrão pelos produtos ou serviços acusados a uma suposta obrigatoriedade de uso das tecnologias patenteadas, já que as patentes foram declaradas essenciais ao padrão, buscam liminares extremamente gravosas contra empresas implementadoras de tecnologias, como a BYTEDANCE.

29. Seus pedidos liminares incluem o impedimento da comercialização e distribuição de produtos, do fornecimento de serviços, do lançamento de novos produtos e serviços em todo o território nacional que utilizem a tecnologia padronizada internacionalmente.

30. Com isso, essas empresas buscam asfixiar as rés dessas ações, que ficam coagidas a ceder ao licenciamento abusivo em termos supra-FRAND para poderem continuar suas atividades empresariais no Brasil, já que essas liminares possuem altas multas cominatórias com potenciais multimilionários.

31. Essas liminares que visam a excluir produtos e serviços do mercado nacional são uma manifesta violação ao compromisso de licenciamento FRAND com o qual se comprometeram irrevogavelmente as titulares dessas patentes que se reclamam como SEPs. Ou seja, essa manobra de ajuizar ações com tais pedidos liminares inibitórios e excludentes configura comportamento contraditório e viola a boa-fé objetiva (artigos 187 e 422 do Código Civil).

32. A **insegurança jurídica** causada pela habitual estratégia de empresas como a VELOS aqui no Brasil gera na BYTEDANCE o temor de ser acionada a qualquer hora, como tantas outras empresas já foram aqui no país e como a BYTEDANCE

dannemann.com.br

**DANNEMANN**
**SIEMSEN**

acabou de ser nos Estados Unidos, ou seja, a ameaça de sofrer com o ajuizamento de nova ação no Brasil é real e iminente.

33. Importante esclarecer desde já que **a BYTEDANCE não pretende obter uma carta-branca para usar quaisquer patentes sem pagar pelo licenciamento. As Autoras estão dispostas a obter o licenciamento das patentes da VELOS, em termos FRAND, que forem válidas, de fato essenciais e utilizadas pelas Autoras.** A BYTEDANCE, apesar de sua disposição em discutir um licenciamento FRAND, foi surpreendida pela VELOS, que começou a ajuizar ações de infração, como a dos Estados Unidos, sem sequer apresentar uma proposta de licenciamento em termos FRAND.

34. Logo, enquanto as partes estão em estágio inicial de negociação, a BYTEDANCE precisa se proteger das investidas abusivas das Rés.

35. Titulares como a VELOS rotineiramente ajuízam essas ações inibitórias pinçando patentes específicas de largos portfólios de patentes alegadamente SEPs para reivindicar em jurisdições favoráveis tutelas inibitórias limitadas a essas patentes, desconsiderando tratarem-se de patentes SEP, sujeitas obrigatoriamente ao licenciamento em termos FRAND.

36. Como não há uma concordância sobre o mérito da declaração de essencialidade das patentes, o que ocorre somente no curso de ações judiciais, não pode haver a presunção de que a declaração de essencialidade da patente, feita unilateralmente pelo próprio titular, constitua indício de essencialidade de fato das patentes objeto da ação. **<u>Portanto, a presente ação não é, de forma alguma, qualquer assunção de uso das tecnologias objeto da ação, mas uma defesa contra um iminente ataque abusivo e anticoncorrencial da empresa irlandesa, assim como de sua filial americana, que se tornou a praxe no cenário brasileiro.</u> O objetivo da BYTEDANCE é alcançar a paz em termos de patentes essenciais com a VELOS no mercado nacional, evitando litígios fragmentados e os riscos deles derivados.**

37. É isso que a BYTEDANCE pretende evitar por meio da presente ação declaratória e de tutela de obrigações específicas, sendo necessário o socorro do Judiciário antes que a VELOS ajuíze uma ação contra a BYTEDANCE no Brasil buscando coagi-la a um licenciamento abusivo por meio do impedimento de suas atividades empresariais no país, apesar de a BYTEDANCE estar disposta a obter o licenciamento das patentes da VELOS, desde que em termos FRAND.

## V – O MÉRITO:

## V.1 – A OBRIGAÇÃO DA VELOS DE CONCEDER UMA LICENÇA FRAND AO INVÉS DE BUSCAR MEDIDAS INIBITÓRIAS CONTRA A BYTEDANCE.

38. O ajuizamento de ação em face da BYTEDANCE nos Estados Unidos e a reiterada instrumentalização do Judiciário brasileiro por empresas como a VELOS indicam provável manobra das Rés nesse mesmo sentido no Brasil. Esse tipo de manobra viola a boa-fé objetiva já que a VELOS, bem como suas antecessoras na titularidade das patentes *sub judice*, como a BLACKBERRY e a SHARP, se comprometeram voluntária e irrevogavelmente a licenciar as patentes que alegam serem essenciais a padrões tecnológicos:



2. The Patent Holder is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the above document.
Negotiations are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO, or IEC.
*Also mark here    if the Patent Holder's willingness to license is conditioned on Reciprocity for the above document.*

(vide **Doc. 05**)

**Tradução livre**: "O titular da patente está preparado para outorgar uma licença a um número irrestrito de aplicantes de forma global e não discriminatória e em termos e condições razoáveis para fazer, usar e vender implementações do documento acima."

39. Para se compreender melhor essa estratégia e a abusividade ora reclamada, necessário que se traga algumas explicações sobre o que são patentes essenciais a padrões tecnológicos, como, por que e por quem são declaradas como tal, os órgãos de definições de padrões, suas políticas de propriedade intelectual, o acesso

13

a todos que tais políticas visam proporcionar e os abusos que visam a coibir por meio do sistema de licenciamento FRAND, que são temas indissociáveis do mérito dessa ação. Em seguida, será visto como as normas do sistema de licenciamento FRAND são positivadas no ordenamento nacional, sendo plenamente vinculantes no Brasil.

## V.1.A – BREVE SÍNTESE DO FUNCIONAMENTO DA INDÚSTRIA.

40. A indústria de telecomunicações desenvolveu um sistema de **padrões tecnológicos** para que dispositivos eletrônicos de diferentes empresas pudessem **interoperar**, de modo a permitir a **compatibilidade de comunicação e operação de funções** entre dispositivos eletrônicos de diferentes fabricantes. Alguns exemplos desses padrões são o MP3, Wifi, BlueTooth, 2G, 3G, 4G, 5G, AVC e HEVC.

41. Esses padrões tecnológicos possibilitam, por exemplo, que o telefone celular de uma empresa possa interoperar com aparelhos produzidos por qualquer outra fabricante, e que qualquer *smart tv* possa receber dados de todos os serviços de *streaming* e apresentar os vídeos em alta definição. Caso contrário, dispositivos de diferentes empresas não conseguiriam interoperar com o de outras, e a eficiência do setor de telecomunicações, essencial aos dias de hoje, seria gravemente prejudicada.

42. Disto decorre que, se uma empresa é impedida de adotar **padrões tecnológicos, passa a** não ter **interoperabilidade**, ficando de fora da indústria. Com isso, pode se imaginar o risco que patentes para tecnologias padronizadas trazem para o ecossistema industrial.

43. Para neutralizar esse risco, estruturou-se *standard-setting organizations* (*SSOs*)[11] – como a *International Telecommunication Union* – ITU[12], o *European Telecommunications Standards Institute* – ETSI[13], e o *Internet Engineering Task Force* – IETF[14] –, que se constituem um ambiente no qual empresas do setor

---

[11] Organizações internacionais que estabelecem modelos e promulgam padrões industriais no que diz respeito a tecnologias, que podem ser adotados por diferentes fabricantes para seus dispositivos, são chamadas de *standard-setting organizations* (*SSOs*).
[12] https://www.itu.int/en/Pages/default.aspx. Acessado em 13.11.2025.
[13] https://www.etsi.org/. Acessado em 13.11.2025.
[14] https://www.ietf.org/. Acessado em 13.11.2025.

14

industrial declaram patentes consideradas essenciais a tecnologias padronizadas, comprometendo-se a licenciá-las em termos *FRAND*. O sistema busca um equilíbrio: enquanto permite que empresas ampliem a implementação de suas patentes através dos padrões, exige que tais empresas se comprometam a licenciar essas tecnologias por meio de *royalties* acessíveis.

44. Ocorre que alguns titulares de patentes declaradas como essenciais adotam práticas abusivas, utilizando tais direitos para exigir royalties em condições *non-FRAND*, ameaçando empresas implementadoras com medidas judiciais destinadas a excluí-las do mercado. Para tanto, valem-se da busca por liminares com o objetivo de coagir essas implementadoras a aceitar royalties incompatíveis com sua capacidade econômica, em evidente desvio da finalidade do compromisso assumido. A presente ação, portanto, tem por finalidade coibir tais condutas, que configuram verdadeiro abuso de direito.

45. Note-se que se apenas uma empresa pudesse beneficiar-se da tecnologia padronizada, por ser detentora de patente que alega essencial ao padrão, todas as demais ficariam excluídas do mercado. Porém, nesta hipótese absurda, o padrão tecnológico perderia a razão de ser, considerando que não haveria mais uma via comum para dispositivos de diferentes empresas poderem se intercomunicar. Ou seja, não haveria a pretendida interoperabilidade que a indústria precisa garantir. Neste caso, apenas o titular da patente poderia participar do padrão, o que tornaria o padrão fechado, uma contradição em seus próprios termos, despido do sentido aberto para o qual foi idealizado.

46. Deixar de cumprir esta obrigação de licenciamento em termos FRAND de patentes alegadas como essenciais pode configurar emboscada de patente (*patent ambush*) e pode constituir uma **grave prática anticoncorrencial**. Importante frisar que essa declaração é **unilateral e parte do detentor da patente**, apenas limitada à patente ou pedido de patente que a titular declara que *possa* ser uma SEP ("*may be essential*", ou "possa ser essencial") e **a SSO não verifica o mérito da autodeclaração**, ou seja, não avalia se a patente declarada como essencial realmente se refere àquela tecnologia específica, ou mesmo se ela é válida.

15

47. O cenário de uma possível estratégia de emboscada é ainda mais delicado neste caso, envolvendo o padrão H.265/HEVC, uma vez que a VELOS apresentou uma declaração genérica à ITU sem especificar quais patentes estão sujeitas à sua declaração de essencialidade. Em outras palavras, a VELOS pode usar essa declaração genérica para alegar que qualquer uma de suas patentes seria essencial.

48. Na prática, padrões tecnológicos podem receber **centenas ou mesmo milhares de famílias de patentes unilateralmente declaradas essenciais por seus titulares**. Mas há uma série de patentes que, apesar de declaradas ou alegadas como essenciais, protegem tecnologias que, na verdade, não são essenciais aos padrões. Ou seja, **não necessariamente cada uma das patentes alegadas como essenciais cobre aspectos correspondentes à tecnologia efetivamente padronizada**.

49. A VELOS afirmar que suas patentes são essenciais para o padrão não comprova que qualquer patente seja de fato essencial, e a BYTEDANCE tem todo o direito de contestar a essencialidade dessas patentes – como fará mais adiante na presente ação. Uma determinação de não essencialidade significa que o padrão pode ser implementado sem usar a patente.

50. Tendo em vista que uma patente alegada como essencial pode não ser implementada no padrão, a ITU publicou as seguintes ressalvas sobre **não assumir um posicionamento acerca das provas técnicas sobre a essencialidade da patente, sua validade** ou a aplicabilidade de direitos de propriedade intelectual – e ressalvas semelhantes são usualmente adotadas pelas demais SSOs[15]:

> "INTELLECTUAL PROPERTY RIGHTS
>
> "ITU draws attention to the possibility that the practice or implementation of this Recommendation may involve the use of a claimed Intellectual Property Right. ITU takes no position concerning the evidence, validity or applicability of claimed Intellectual Property Rights, whether asserted by ITU members or others outside of the Recommendation development process.

---

[15] https://www.itu.int/rec/T-REC-H.265-201911-I/en.

dannemann.com.br

**DANNEMANN**
**SIEMSEN**

As of the date of approval of this Recommendation, ITU had received notice of intellectual property, protected by patents, which may be required to implement this Recommendation. However, implementors are cautioned that this may not represent the latest information and are therefore strongly urged to consult the TSB patent database."

**Tradução livre:**

"A ITU chama a atenção para a possibilidade de que **a prática ou implementação desta Recomendação possa envolver o uso de um Direito de Propriedade Intelectual. A ITU não assume nenhuma posição em relação à prova, validade ou aplicabilidade dos direitos de propriedade intelectual reivindicados, sejam declarados por membros da ITU ou outros fora do processo de desenvolvimento da Recomendação**.

**Na data de aprovação desta Recomendação, a ITU havia recebido notícia de propriedade intelectual, protegida por patentes, que pode ser necessária para a implementação desta Recomendação**. No entanto, os implementadores são alertados de que isso pode não representar as informações mais recentes e, portanto, são fortemente recomendados a consultar o banco de dados de patentes do TSB." (grifos)

51. Assim, durante o trâmite para estabelecimento de padrões tecnológicos, os membros da respectiva SSO, ou do consórcio formado por múltiplas organizações, podem fazer propostas técnicas para inclusão no padrão, então os membros debatem coletivamente e decidem quais propostas aceitar e quais rejeitar. Quando concluído, o padrão escrito finalizado é publicado para uso pelo setor industrial. Nesse momento, a indústria fica vinculada ao uso do padrão para garantir a interoperabilidade e eficiência nas telecomunicações.

"**In a typical standardization process, it is the participants that drive a standard's development by proposing the inclusion of what they deem to be the most appropriate methodologies, technologies or technical solutions**. The development of such methodologies, technologies or technical solutions is often a complex, costly endeavour demanding investments in R&D that can span several years. Yet, **for a variety of reasons, many companies volunteer their patented innovations for inclusion in standards**. Standards can incorporate literally thousands of patents, and the associated difficulties have been compounded by the fact that the development of standards sometimes anticipates the progression of technology rather than following it."[16]

---

[16] ITU – *Understanding patents, competition & standardization in an interconnected world* https://www.itu.int/en/ITU-T/Documents/Manual_Patents_Final_E.pdf. Acessado em 13.04.2025.

**DANNEMANN**
**SIEMSEN**

**Tradução livre:**

"**Em um processo de padronização típico, são os participantes que conduzem o desenvolvimento de um padrão, propondo a inclusão do que eles consideram ser as metodologias, tecnologias ou soluções técnicas mais adequadas**. O desenvolvimento de tais metodologias, tecnologias ou soluções técnicas é frequentemente uma tarefa complexa e cara que exige investimentos em P&D que podem durar vários anos. No entanto, **por uma variedade de razões, muitas empresas oferecem voluntariamente suas inovações patenteadas para inclusão em padrões. Os padrões podem incorporar literalmente milhares de patentes**, e as dificuldades associadas foram agravadas pelo fato de que o desenvolvimento de padrões às vezes antecipa a progressão da tecnologia em vez de segui-la." (grifos)

52. Como todas as empresas utilizam as tecnologias padronizadas – já que é a única forma de seus produtos, serviços ou dispositivos conseguirem se comunicar com os demais –, o titular de uma patente autodeclarada essencial tem uma **enorme vantagem econômica**, gerada pela multiplicidade de empresas que estarão dispostas a serem licenciadas para aquela tecnologia. Por outro lado, a **contrapartida** desta enorme vantagem econômica é a segunda parte da regra objetiva formatada para atender aos reclamos concorrenciais: que **a titular de uma SEP pode apenas cobrar *royalties* em termos FRAND**, ou seja, termos **justos, razoáveis e não discriminatórios**.

53. Essa foi a conclusão do CADE que, em recente decisão discutindo patentes essenciais a padrões, abriu investigação em face da ERICSSON, titular de SEPs processando uma implementadora, assim como a VELOS, por práticas anticoncorrenciais decorrentes do ajuizamento de ações judiciais abusivas envolvendo patentes essenciais:

*"Preenchidos os requisitos acima, entendo que a empresa detentora de uma patente essencial a um padrão tem a **obrigação** de licenciar a sua patente em termos claros e **não discriminatórios**. Eventual recusa de licenciar tal patente **pode ser considerada como uma infração à ordem econômica**, se o interessado no licenciamento tiver feito esforços para obter autorização do titular do direito em termos e condições comerciais razoáveis e tais esforços não tiverem sido bem-sucedidos dentro de um período de tempo razoável (art. 31, 'b' do acordo TRIPS)."* (CADE, Voto do Conselheiro Gustavo Augusto no Recurso Voluntário nº 08700.010219/2024-17 – grifos)

**DANNEMANN
SIEMSEN**

54. **As obrigações FRAND são projetadas para evitar a prática de _hold-up_ de patentes**, ou seja, **situações em que os detentores de patentes alegadamente essenciais a padrões exigem** _royalties_ **excessivos do mercado depois que os licenciados em potencial já estão comprometidos a usar o padrão finalizado**. Ou seja, **a definição da obrigação ao licenciamento FRAND objetiva evitar o uso abusivo de patentes para gerar lucros excessivos, bem como a eliminação de atores econômicos do mercado**. As obrigações FRAND também são projetadas para desencorajar o empilhamento de _royalties_, ao incentivar uma taxa de _royalties_ razoável para produtos que podem implementar centenas ou milhares de patentes que possam ser necessárias para a adoção do padrão. Para essas situações, licenças de patentes essenciais são rotineiramente negociadas com base em portfólios, porque seria inviável se negociar uma licença para cada patente individualmente.

55. Em suma, o objetivo da regra do licenciamento FRAND é **garantir o amplo acesso ao padrão** a todos os interessados e **impedir abusos de direito** por parte de titulares de patentes que são essenciais ao padrão. Não fosse essa regra, tais titulares estariam livres para explorar _royalties_ extorsivos de todas as empresas do mercado, o que encareceria de forma expressiva os produtos e inviabilizaria os negócios e a evolução tecnológica e social.

56. Para compreender a dimensão do problema, considere que uma obra audiovisual, como um vídeo online, depende de múltiplas tecnologias para apresentar o conteúdo. Algumas dessas tecnologias são padronizadas – como o H.265/HEVC, por exemplo – e não pertencem a uma única empresa. Ao contrário, são resultado da contribuição de várias empresas, cada uma detentora de patentes essenciais para implementar o padrão. Como consequência, utilizar uma tecnologia comum como o H.256/HEVC frequentemente exige licenças de múltiplos titulares de patentes. Se cada titular de SEP pudesse exigir _royalties_ excessivos sem cumprir as obrigações de licenciamento FRAND, o custo de assinar um serviço de _streaming_ poderia se tornar exorbitante.

**DANNEMANN**
**SIEMSEN**

57. Como a titular de uma patente que alega ser essencial para a implementação de um padrão, a VELOS está vinculada ao seu compromisso e de seus antecessores em licenciar essas patentes em termos e condições FRAND e em negociar de boa-fé com empresas, como a BYTEDANCE, que estão dispostas a obter essa licença em termos FRAND. Procurar excluir do mercado licenciados dispostos a licenciar, como a BYTEDANCE, violaria esses compromissos de licenciamento. Ao comprometer-se a licenciar as suas patentes essenciais em termos FRAND, o detentor de uma SEP concorda em fornecer acesso a todos os intervenientes no mercado interessados em licenciar a tecnologia em termos FRAND. Assim, a patente para tecnologia que é essencial ou necessária para a implementação do padrão não é – e não pode ser – uma barreira para impedir que *willing licensees*, como a BYTEDANCE, participem no mercado.

58. A finalidade geral das declarações às SSOs e de licenciamento em termos FRAND é garantir, juntas, que os detentores de patentes essenciais **(i) não usarão da ameaça de *patent hold-up* ou de ações judiciais** para obter **taxas de licenciamento excessivas**, **desproporcionais** ao valor das patentes (ou seja, a taxa de licenciamento deve ser **razoável**); e **(ii) <u>não bloquearão uma empresa da indústria por meio da recusa de licenciamento</u>** ou ao dificultar sua capacidade de <u>competir em igualdade de condições</u>, **<u>exigindo valores mais altos</u>** que aqueles oferecidos para empresas em situação semelhante (ou seja, o licenciamento **<u>não pode ser discriminatório</u>**).

59. No presente caso essa limitação é ainda mais flagrante ao se observar **que a VELOS sequer apresentou qualquer proposta de licença do seu portfólio de patentes à BYTEDANCE. Não pode haver termos FRAND quando sequer há uma proposta.**

60. Em razão do compromisso ao licenciamento em termos FRAND, em ações de infração envolvendo patentes que seus titulares alegam serem essenciais, idealmente, os Tribunais devem, *primeiro*, confirmar se a patente objeto da controvérsia é realmente essencial ao padrão, e não foi apenas alegada por sua titular como tal. Caso o seja, os Tribunais devem então verificar se a titular empenhou

os esforços necessários para negociar uma licença em termos FRAND com o acusado de usar a tecnologia patenteada e alegadamente padronizada.

61. Tal verificação tem a finalidade importantíssima de garantir que **não haja abusos anticoncorrenciais, como o abuso de posição dominante do titular** da patente alegadamente essencial, que faça uso do título patentário através de medidas inibitórias e excludentes contra empresas atuantes do mercado.

62. Também visa a verificar se as ações do titular estão em conformidade com o princípio da boa-fé objetiva, que surge quando o titular alega que sua patente é essencial para o padrão. Em outras palavras, ele está vinculado à sua declaração que inclui o compromisso FRAND.

63. Contudo, o que se tem observado reiteradamente é a instrumentalização de ações inibitórias para realização de prática anticoncorrencial que se opera da seguinte forma: o titular da patente alegadamente essencial ao padrão ajuíza ações com pedidos liminares inibitórios contra implementadores os acusando de infração de SEPs, sem antes oferecer uma proposta FRAND.

64. É justamente esse o cenário que esta ação declaratória busca evitar.

### V.1.B – POSITIVAÇÃO DAS REGRAS DO LICENCIAMENTO FRAND NO ORDENAMENTO BRASILEIRO.

65. Um ponto em comum entre todas as costumeiras ações inibitórias ajuizadas abusivamente por titulares de patentes essenciais ao padrão no Brasil é o tratamento conferido pelas autoras dessas ações às suas patentes reivindicadas. Apesar de alegarem que seriam essenciais aos respectivos padrões tecnológicos, fazendo uso da prerrogativa da essencialidade para buscarem tutelas inibitórias de caráter cautelar em ações de alta complexidade técnica, requerem em juízo a tutela específica conferida pelo artigo 42 da LPI. Ou seja, o típico direito de exclusão.

**DANNEMANN**
**SIEMSEN**

66. Argumentam que não teriam interesse em receber qualquer pagamento, mas buscam o Judiciário, supostamente, apenas para impedir o uso desautorizado das tecnologias patenteadas. Ora, se isso fosse verdade, não estariam todas as autoras dessas ações sempre investidas em negociações de licenciamento com as rés. E mesmo que não houvesse negociação, a afirmação de que não pretenderiam o recebimento de quaisquer valores, mas a tutela específica do artigo 42 da LPI, ou seja, o direito de exclusão, é totalmente contrária às normas do licenciamento FRAND vistas no capítulo anterior.

67. Ao assim fazerem, essas titulares de SEPs ignoram que seus compromissos contratuais voluntária e irrevogavelmente assumidos perante as SSOs são **plenamente válidos e eficazes no Brasil**. Isso porque o ordenamento jurídico pátrio possui mecanismos que não só tornam tais compromissos válidos, como totalmente aplicáveis em território nacional.

68. **Isso porque o ordenamento jurídico brasileiro preconiza o princípio do *pacta sunt servanda* – força obrigatória que os pactos, contratos e obrigações estabelecem aos contratantes, sem prejuízo das disposições do Código Civil, especialmente o princípio da boa-fé objetiva (artigos 113, 187 e 422 do Código Civil). Portanto, os compromissos voluntários de licenciamento FRAND assinados pela VELOS, ou suas antecessoras, e entregues à ITU (Docs. 05 e 06) constituem acordos vinculantes e exequíveis entre a VELOS e a ITU, capazes de serem invocados por terceiros, como a BYTEDANCE.**

**DANNEMANN**
**SIEMSEN**

PATENT STATEMENT AND LICENSING DECLARATION FORM FOR
ITU-T OR ITU-R RECOMMENDATION | ISO OR IEC DELIVERABLE

      

**Patent Statement and Licensing Declaration**
for ITU-T or ITU-R Recommendation | ISO or IEC Deliverable

*This declaration does not represent an actual grant of a license*

Please return to the relevant organization(s) as instructed below per document type:

| Director Telecommunication Standardization Bureau International Telecommunication Union Place des Nations CH-1211 Geneva 20, Switzerland Fax +41 22 730 5853 Email tsbdir@itu.int | Director Radiocommunication Bureau International Telecommunication Union Place des Nations CH-1211 Geneva 20, Switzerland Fax +41 22 730 5785 Email brmail@itu.int | Secretary-General International Organization for Standardization 8 chemin de Blandonnet CH-1214 Geneva Switzerland Fax +41 22 733 3430 Email patent.statements@iso.org | General Secretary International Electrotechnical Commission 3 rue de Varembe CH-1211 Geneva 20 Switzerland Fax +41 22 919 0300 Email inmail@iec.ch |
|---|---|---|---|

**Patent Holder:**

Legal Name — Velos Media International Limited

**Contact for license application:**

Name & Department Address — Fred Telecky

Unit 32, Hyde Building, The Park

Carrickmines, Dublin 18, Ireland

Tel. — +35315560055

Fax

E-mail — info@velosmedia.com

URL (optional) — velosmedia.com

**Document type:**

☒ ITU-T Rec. (*)   ☐ ITU-R Rec. (*)   ☒ ISO Deliverable (*)   ☒ IEC Deliverable (*)
(please return the form to the relevant Organization)

☒ Common text or twin text (ITU-T Rec. | ISO/IEC Deliverable (*)) (for common text or twin text, please return the form to each of the three Organizations: ITU-T, ISO, IEC)

☐ ISO/IEC Deliverable (*) (for ISO/IEC Deliverables, please return the form to both ISO and IEC)

(*)Number — ITU-T H.265 | ISO/IEC DIS 23008-2

(*)Title — High Efficiency Video Coding

☒   2.     The Patent Holder is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the above document.
Negotiations are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO, or IEC.
*Also mark here ___ if the Patent Holder's willingness to license is conditioned on Reciprocity for the above document.*

(vide **Doc. 06**)

**DANNEMANN**
**SIEMSEN**

**Tradução livre**: "O titular da patente está preparado para outorgar uma licença a um número irrestrito de aplicantes de forma global e não discriminatória e em termos e condições razoáveis para fazer, usar e vender implementações do documento acima."

69. Além disso, não se pode perder de vista que o artigo 17 da Lei de Introdução às Normas do Direito Brasileiro – LINDB (Decreto-lei nº 4.657/42) e a jurisprudência[17], reconhecem a eficácia de leis, atos, sentenças e quaisquer declarações de vontade oriundos de outros países, desde que não ofendam a soberania nacional, a ordem pública e os bons costumes, o que não é o caso das declarações de essencialidade de patentes.

70. O legislador infraconstitucional, em observância ao artigo 5º, XXIX, da Constituição Federal, que assegura aos autores de inventos industriais privilégio temporário para sua utilização, incluiu regras gerais sobre patentes, por meio da Lei da Propriedade Industrial, **que contém dispositivos que não são os únicos relevantes no que diz respeito ao regime jurídico das patentes no Brasil.** O privilégio temporário atrelado às patentes é regulado e modulado por diversas outras normas do direito brasileiro. Objetivamente, não é apenas o artigo 42 da LPI que deve ser levado em consideração para a resolução das demandas envolvendo patentes declaradamente essenciais a um padrão. A declaração de essencialidade no ordenamento jurídico pátrio é plenamente condizente com o art. 113, § 1º, inciso II, do Código Civil[18].

71. Não significa dizer que a titular de uma patente essencial ao padrão renuncia ao direito de que outros não utilizem suas patentes sem sua permissão, mas <u>modula um dos seus remédios jurídicos, qual seja, o de durante as discussões sobre o valor FRAND dos *royalties* cabíveis impedir o uso da patente por quem encontra-se disposto a pagar esses *royalties*,</u> como é o caso da BYTEDANCE.

72. A questão está longe de ser resolvida conforme a simplicidade e leviandade que as titulares costumam buscar em suas ações a aplicabilidade irrestrita e descompassada do direito previsto no artigo 42 da LPI.

---

[17] STJ - SEC: 879 US 2005/0035096-5, Relator: Ministro LUIZ FUX, Data de Julgamento: 02/08/2006, CE - CORTE ESPECIAL, Data de Publicação: 25/09/2006.
[18] "Art. 113. Os negócios jurídicos devem ser interpretados conforme a boa-fé e os usos do lugar de sua celebração. § 1º A interpretação do negócio jurídico deve lhe atribuir o sentido que: (...) II - corresponder aos usos, costumes e práticas do mercado relativas ao tipo de negócio."

dannemann.com.br

DANNEMANN
SIEMSEN

73. Titulares de patentes alegadamente essenciais ao padrão não devem ser autorizadas a se valer de remédios tradicionalmente aplicáveis às patentes comuns (NEPs) se o implementador estiver disposto a negociar tais patentes essenciais em termos FRAND. Isso porque retirar do mercado uma implementadora que não aceitou o preço unilateralmente estipulado por considerá-lo fora de termos FRAND **configura exercício abusivo de direito**, na medida em que, no caso da patente essencial, o uso por terceiros **não** é sempre propriamente *facultativo*: em muitos casos, ou se adere ao padrão, ou pode ter sua presença no mercado severamente impactada em comparação a outras empresas. O licenciamento é obrigatório para todas as partes justamente para se garantir a interoperabilidade vista acima, que é a razão do modelo de licenciamento de SEPs ter sido desenhado como tal.

74. Essa impossibilidade de buscar medidas liminares contra licenciados dispostos a licenciar também está prevista na lei antitruste brasileira (como será demonstrado no capítulo seguinte, que abordará o entendimento do CADE sobre o assunto). A proteção da concorrência não permite o uso abusivo dos direitos de propriedade intelectual (Artigo 36, §3, XIX), nem o abuso de posição dominante (Artigo 36, IV).

75. A conduta dos titulares viola, em última análise, ambas as disposições da lei antitruste: há abuso de posição dominante ao usar essa titularidade para se recusar a negociar suas patentes em termos FRAND; e há abuso no exercício dos direitos de propriedade intelectual no uso dessas patentes, não para fazer valer a proteção garantida, mas para pressionar o implementador a aceitar termos supra-FRAND.

76. De fato, a positivação das regras do licenciamento FRAND já vem sendo observada desde 2015 no Judiciário nacional, quando a Exma. Juíza Maria Christina Rucker, então titular da 2ª Vara Empresarial do Rio de Janeiro, proferiu brilhante decisão, pioneira na época, observando todas as particularidades relevantes de uma ação inibitória pautada em patente essencial e constatando que não pode ser tratada como uma simples ação típica de patentes, em que se aplica o artigo 42 da LPI:

**DANNEMANN**
**SIEMSEN**

"De acordo com as próprias narrativas autorais, para que os aparelhos da ré estejam habilitados a utilizar as redes 2G e 3G, têm necessariamente que utilizar a tecnologia patenteada. **Surge um ponto de tensão entre o direito industrial e a necessidade de utilização de padrões impostos pelos próprios setores. Para o usuário utilizar a tecnologia, necessita da autorização do titular da patente, sem a qual incorrerá em infração.**
**No entanto, se este não conseguir a licença de uso da tecnologia incorporada na norma padrão, o seu direito de exercício da atividade econômica pode ser inviabilizado.**
**Realmente, não seria lógico que a autora, após ceder a tecnologia para a formação de um padrão pudesse, com base na propriedade industrial, impedir a fabricação e comercialização de produtos de outras empresas, o que fere a livre iniciativa e a livre concorrência, que se configuram princípios constitucionais da ordem econômica e também buscam a defesa do consumidor. Deve-se garantir a proteção do direito industrial sem permitir o abuso deste.**
**Desta feita, nas tratativas de padronização, as sociedades empresárias que participam do processo de padronização e cedem suas patentes, se comprometem a licenciá-las em termos justos e razoáveis. É verossímil a alegação da ré quanto a impossibilidade de recusa do licenciamento da patente.**
Neste sentido, a parte ré junta aos autos documento de fls. 490/525 que contém proposta de pagamento de *royalties* pelo licenciamento da tecnologia patenteada, mas que não chegou a ser concluída porque de acordo com a ré, não houve concordância com os valores cobrados.
A parte ré, buscando a suspensão da tutela antecipada, se compromete a depositar o valor de 2%, exigidos como royalties sob suas projeções de vendas para os próximos seis meses, que sustenta totalizar R$2.250.183,00, ficando certo que este valor é depositado apenas a título de caução para caso de eventual procedência do pedido autoral. Também se compromete a apresentar uma relação dos aparelhos já comercializados, bem como de apresentar relatórios trimestrais, efetuando os depósitos correspondentes.
Tal conduta realmente é capaz de, em princípio, evitar os danos alegados pela ré pela utilização não autorizada da patente.
Realmente, o que se verifica é a existência de dano inverso, ante a impossibilidade de comercialização dos aparelhos pela ré.
Desta feita, após a realização do depósito em juízo do valor de 2% de cada aparelho comercializado no valor a princípio de R$2.250.183,00, FICA REVOGADA a Tutela Antecipada deferida" (grifos)[19]

77. Desde então, alguns outros Juízos cariocas já observaram também a necessidade de se verificar a efetiva essencialidade das patentes reivindicadas, bem como o cumprimento do compromisso com o licenciamento FRAND em negociações antes de cogitarem tutelas inibitórias de natureza provisória[20], o que mostra um maior

---

[19] Processo nº 0005896-94.2015.8.19.0001, 2ª Vara Empresarial do Rio de Janeiro.
[20] DISNEY v. INTERDIGITAL (processo nº 0811901-50.2025.8.19.0001), MITSUBISHI v. SEMP TCL (processo nº 0809129-51.2024.8.19.0001), DOLBY v. SEMP TCL (processo nº 0947617-20.2023.8.19.0001) e JVCKENWOOD v.

**DANNEMANN**
**SIEMSEN**

entendimento do sistema de patentes essenciais e a positivação dessas normas no ordenamento brasileiro.

## V.2 – O RECURSO VOLUNTÁRIO NO CADE E A RECENTE DECISÃO DO TRIBUNAL DO REINO UNIDO.

78. Os contornos dessa obrigação de licenciar em termos FRAND/não intentar medidas inibitórias contra implementadores foram recentemente parametrizados pelo Conselho Administrativo de Defesa Econômica – CADE em sua decisão nos autos do Recurso Voluntário nº 08700.010219/2024-17 (**Doc. 07**). Nele, o Conselho requereu a abertura de inquérito contra a ERICSSON, titular de diversas patentes declaradas essenciais, para investigação de práticas anticoncorrenciais. Tais práticas se assemelham àquelas intentadas pela VELOS, como o ajuizamento diversas ações judiciais no mundo como forma de forçar as implementadoras a assinarem um contrato de licenciamento em termos abusivos sem sequer oferecer uma licença de suas patentes em termos FRAND.

79. Conforme já indicado, o Conselho indicou **que o titular da patente está vinculado a sua alegação de essencialidade e é obrigado a licenciar suas patentes em termos FRAND <u>inclusive no Brasil</u>**:

> *"Preenchidos os requisitos acima, entendo que a empresa detentora de uma patente essencial a um padrão tem a **obrigação** de licenciar a sua patente em termos claros e **não discriminatórios**. Eventual recusa de licenciar tal patente **pode ser considerada como uma infração à ordem econômica**, se o interessado no licenciamento tiver feito esforços para obter autorização do titular do direito em termos e condições comerciais razoáveis e tais esforços não tiverem sido bem-sucedidos dentro de um período de tempo razoável (art. 31, 'b' do acordo TRIPS)."* (CADE, Voto do Conselheiro Gustavo Augusto no Recurso Voluntário nº 08700.010219/2024-17 – grifos)

80. Para o Conselho, ações como aquelas que a BYTEDANCE reputa como abusivas têm como objetivo não só tirar a implementadora do mercado, mas apresentar

---

SEMP TCL (processo nº 0938160-61.2023.8.19.0001), além dos processos em segredo de justiça nº 0101529-57.2023.8.19.000 e nº 0101529-57.2023.8.19.0000.

DANNEMANN
SIEMSEN

condições para que a titular, no caso a VELOS, cobre *royalties* ainda mais elevados das demais empresas:

> "*Aponto que a Ericsson ajuizou uma ação judicial específica, com o objetivo de compelir a Motorola-Lenovo a parar a produção de aparelhos 5G. **Trata-se de conduta com propósito exclusionário.** Ao excluir a Motorola-Lenovo do mercado brasileiro, a Ericsson fortaleceria os licenciados já existentes, o que **poderia justificar a cobrança de royalties mais elevados**. Embora a Ericsson não concorra diretamente no mercado, ela recebe indiretamente uma participação sobre as receitas das vendas dos licenciados, pois o valor dos seus royalties são influenciados pelo valor de venda dos dispositivos e pelo número de dispositivos vendidos, como verificado na dilação probatória (SEI 1513453). De toda forma, a LDC expressamente prevê como infração não só a discriminação a concorrentes, como também a de adquirentes ou fornecedores.*" (CADE, Voto do Conselheiro Gustavo Augusto no Recurso Voluntário nº 08700.010219/2024-17 – grifos)

81. A partir disso, a autoridade de antitruste brasileira concluiu que a ERICSSON atuou em violação frontal ao princípio da boa-fé objetiva:

> "*Concluo, portanto, como constatado pela Justiça britânica, que a estratégia da Ericsson, ao ingressar com distintas ações por todo o mundo, é influenciar o processo de negociação e exercer uma indevida pressão sobre o interessado no licenciamento. No caso concreto, a atuação da Ericsson buscou especificamente minar e escapar dos procedimentos determinados pelo Tribunal de Patentes britânico e no litígio existente nos EUA. Não se trata, portanto, de um propósito competitivo, como impedir um free-rider ou proteger seus investimentos em inovação. O que buscou a recorrida foi usar dessas diversas ações para criar obstáculos ao interessado e tentar **escapar de uma obrigação por ela mesma assumida**, que seria o de praticar preços não discriminatórios e amigáveis (FRAND). Nesse contexto entendo, como entendeu a Justiça Britânica, que **tal conduta violou a boa-fé objetiva**.*" (CADE, Voto do Conselheiro Gustavo Augusto no Recurso Voluntário nº 08700.010219/2024-17 – grifos)

82. Diante da ausência de comprovação por parte da VELOS de que negociou com a BYTEDANCE em termos FRAND, bem como todos os indícios ora apresentados de que as Rés estão em vias de atuar de forma abusiva, contrária à boa-fé e contrária à concorrência também no Brasil, como acabam de fazer nos Estados Unidos, a presente ação busca justamente neutralizar essa tentativa.

dannemann.com.br

83. Outro fato relevante para a análise desta lide é a recente decisão da corte do Reino Unido (**Doc. 08**) que, também no contexto do litígio entre ERICSSON e LENOVO, abordou diretamente a estratégia da empresa sueca de ajuizar ações com pedidos de liminares inibitórias em jurisdições estrangeiras, como Brasil, Colômbia e Alemanha, como meio de pressionar a LENOVO nas negociações de uma licença para seu portfólio.

84. Naquele caso, a corte inglesa reconheceu que a ERICSSON obteve liminares no Brasil e na Colômbia que impediam a LENOVO de comercializar dispositivos 5G nos mercados desses países, o que tem impacto significativo em sua atividade comerciais, especialmente por se tratar de mercados estratégicos para a LENOVO.

85. A corte inglesa considerou que essas medidas judiciais agressivas podem ser utilizadas como uma tática para coagir a contraparte a aceitar termos contratuais mais favoráveis à titular das patentes, o que pode configurar prática de "*hold up*" – conduta abusiva condenada no contexto de obrigações FRAND, como visto acima. Essa abordagem agressiva é exatamente o que a BYTEDANCE está tentando evitar com a presente ação.

86. O que buscam as Autoras nesta lide é obter a proteção do Judiciário contra uma muito provável e iminente investida da VELOS contra as atividades da BYTEDANCE no Brasil. Por isso, considerando todas as relevantes razões expostas acima, as Autoras requerem, na medida em que este d. juízo entenda que quaisquer das patentes da VELOS seriam de fato essenciais ao padrão de codificação de vídeo H.265/HEVC (ou ao padrão de codificação de vídeo relacionado H.266/VVC), a declaração judicial de que a VELOS deve conceder uma licença destas patentes à BYTEDANCE (o que engloba seus parceiros comerciais) em termos FRAND, ao invés de buscar medidas inibitórias abusivas através de ações judiciais em violação ao seu compromisso FRAND.

29



## V.3 – DEMONSTRAÇÃO TÉCNICA E EXEMPLIFICATIVA DO EXCESSO E ABUSO DA VELOS NA AUTODECLARAÇÃO DE ESSENCIALIDADE DE SUAS PATENTES, EM ESPECIAL, AO PADRÃO HEVC.

87. Portanto, conforme exposto, o objeto da presente demanda é declarar que, após comprometer-se a licenciar determinadas patentes em termos FRAND (Fair, Reasonable and Non-Discriminatory), e após tê-las declarado como essenciais a padrões técnicos, a empresa VELOS não poderia vir ao Brasil e requerer medidas liminares com fundamento nessas mesmas patentes — justamente aquelas que ela própria se obrigou a licenciar em condições justas, razoáveis e não discriminatórias.

88. Entretanto, como será demonstrado, a situação concreta é ainda mais grave. As patentes que a VELOS declarou como essenciais — e que estão sendo objeto de negociação com a BYTEDANCE, sob a alegação de cobrirem tecnologias padronizadas — sequer se referem a tecnologias efetivamente padronizadas. Em outras palavras, tratam-se de patentes irrelevantes do ponto de vista técnico, pois não abrangem tecnologias utilizadas na indústria, sendo distintas daquelas definidas nos respectivos padrões técnicos.

89. Como exemplo dessa conduta abusiva, a BYTEDANCE analisou algumas dessas patentes e verificou que elas, de fato, não cobrem tecnologias padronizadas.

90. A análise técnica realizada pelo especialista consultado pela BYTEDANCE (Dr. Gustavo Fraidenraich (Universidade Estadual de Campinas – UNICAMP)) compara, de forma sistemática, dez patentes brasileiras que tratam de técnicas associadas à codificação e decodificação de vídeo digital, com ênfase no padrão internacional H.265/HEVC (High Efficiency Video Coding). Embora as patentes pertençam ao mesmo campo tecnológico, elas abordam soluções distintas, incluindo reconstrução de mapas de significância, agrupamento e sinalização de coeficientes, ocultação de bits, seleção de contextos de codificação, entre outros aspectos técnicos. Em sua maioria, essas soluções derivam de propostas experimentais formuladas em fases preliminares do desenvolvimento do padrão HEVC, o que leva a diferenças

dannemann.com.br

**DANNEMANN**
**SIEMSEN**

estruturais relevantes entre o que é reivindicado nas patentes e o que efetivamente foi padronizado.

91. O objetivo central da análise é demonstrar que os elementos técnicos descritos nas reivindicações principais de cada patente não estão presentes no padrão H.265/HEVC ou qualquer outro padrão de vídeo relacionado.

92. A abordagem é feita em referência ao padrão HEVC definida de forma normativa. São examinadas cláusulas específicas da norma que tratam da decodificação de blocos residuais, transformadas inversas, sinalização de coeficientes, estruturação de quadros e utilização do codificador de entropia CABAC (Context-Adaptive Binary Arithmetic Coding).

93. Assim, a análise demonstra, de forma fundamentada e tecnicamente precisa, que as soluções reivindicadas nas patentes examinadas não são implementadas pelo HEVC, seja de forma literal, funcionalmente equivalente ou compatível com sua arquitetura. A análise técnica é complementada por uma apresentação acessível dos principais conceitos envolvidos na compressão de vídeo, como os tipos de quadros (I, P e B), estruturas hierárquicas de codificação (CTBs, CUs, TUs), uso de transformadas (DCT, DST), sinalização por coeficientes e técnicas de codificação de entropia. Entre essas técnicas, destaca-se o uso exclusivo do CABAC no HEVC, que combina modelagem de contexto com codificação aritmética adaptativa para representar os dados de vídeo de forma extremamente eficiente.

94. Por fim, observa-se que a norma HEVC especifica de forma clara quais sinalizadores binários são codificados com modelagem de contexto e quais seguem codificação fixa (bypass), assegurando previsibilidade, interoperabilidade e conformidade técnica. A estrutura modular e adaptativa do HEVC reforça, portanto, a conclusão de que não há sobreposição técnica entre o padrão e as soluções reivindicadas nas patentes analisadas.

95. Neste sentido, a VELOS possui diversas patentes que alega serem essenciais a padrões, como o H.265/HEVC. A seguir, será demonstrado com base na Nota

31



Técnica emitida pelo renomado professor Dr. Gustavo Fraidenraich que nem todas as patentes da VELOS são verdadeiramente essenciais (**Doc. 09**).

## V.3.A – DA NÃO-ESSENCIALIDADE DA PATENTE BR102012027259-8 PARA O PADRÃO H.265/HEVC

96. A patente BR102012027259-8, intitulada "Método e decodificador para decodificação de um fluxo de bit de dados codificados", refere-se a um método e a um decodificador para reconstrução de mapas de significância em fluxos de vídeo codificados.

97. A suposta invenção descrita nesta patente propõe o uso de particionamento espacial não uniforme dentro da unidade de transformada, no qual diferentes regiões do mapa de significância recebem diferentes contextos estatísticos para decodificação adaptativa. Esse mecanismo de seleção de partições permite associar cada posição de bit a um contexto específico, definido previamente ou escolhido com base no tamanho da unidade de transformação ou no tipo de conteúdo sendo processado.

98. A reivindicação nº 1 da patente BR102012027259-8, reproduzida abaixo, define os elementos-chave da suposta invenção proposta:

### Reivindicação 1 de BR102012027259-8

*"1. Método de decodificação de um fluxo de bit de dados codificados para a reconstrução de um mapa de significância para uma unidade de transformada, o método caracterizado pelo fato de compreender:*
*para cada posição de bit no mapa de significância tendo um indicador de coeficiente significante que deve ser decodificado usando decodificação adaptativa ao contexto,*
*a determinação de um contexto para aquela posição de bit com base em um conjunto de partição,*
*a decodificação dos dados codificados com base no contexto determinado para a reconstrução de um valor de bit, e*
*a atualização do contexto com base naquele valor de bit reconstruído,*
*em que os valores de bit reconstruídos formam o mapa de significância reconstruído;*
*e em que o conjunto de partição atribui contextos para posições de bit dentro do mapa de significância de modo que*
*a cada posição de bit em um quadrante superior esquerdo do mapa de significância é atribuído um de pelo menos quatro contextos,*
*a um quadrante superior direito e a um quadrante inferior esquerdo do mapa de significância são atribuídos quatro a seis contextos diferentes*



> *dos referidos pelo menos quatro contextos, em que cada um dos quatro*
> *a seis contextos é atribuído a pelo menos duas posições de bit, e*
>    *a uma maioria de posições de bit em um quadrante inferior direito*
> *é atribuído um único contexto."*

99. Todavia, como esclarece o Prof. Gustavo Fraidenraich em seu parecer, elementos-chave da invenção, descritos em sua reivindicação independente nº 1, não são reproduzidos do padrão H.265/HEVC:

100.  A reivindicação nº 1 da patente exige *"a determinação de um contexto para aquela posição de bit com base em um conjunto de partição"*. Todavia, como explicado pelo Prof. Gustavo Fraidenraich, o padrão H.265/HEVC não atende a esta limitação da reivindicação:

> **Prof. Gustavo Fraidenraich**
> *"A Reivindicação 1 exige explicitamente "a determinação de um contexto para aquela posição de bit com base em um conjunto de partição". A Reivindicação 1 também exige que "a cada posição de bit em um quadrante superior esquerdo do mapa de significância é atribuído um de pelo menos quatro contextos, a um quadrante superior direito e a um quadrante inferior esquerdo do mapa de significância são atribuídos quatro a seis contextos diferentes dos referidos pelo menos quatro contextos, em que cada um dos quatro a seis contextos é atribuído a pelo menos duas posições de bit". Esses elementos, lidos em conjunto, implicam que o decodificador deve possuir um mecanismo que divida o mapa de significância em quadrantes (partições) e que a seleção do contexto dependa dessa estrutura de partição.*
>
> *No padrão H.265, essa etapa não existe. O decodificador HEVC não divide previamente o mapa de significância em quadrantes para então determinar o contexto de uma posição de bit com base em um conjunto de partição correspondente ao quadrante; o decodificador simplesmente consulta uma tabela fixa de mapeamento de índices de contexto (ver Figura 8 abaixo), que contém o ctxIdxMap, quando a unidade de transformada é 4×4. Esse mapa estabelece, de forma totalmente determinística, qual índice de contexto (contextIdx) deve ser utilizado para cada posição da unidade de transformada (TU) 4×4."*

101.  O Prof. Gustavo Fraidenraich fornece explicações adicionais em sua nota técnica sobre o motivo pelo qual a tecnologia reivindicada na patente BR102012027259-8 não é reproduzida em certas implementações do padrão H.265/HEVC.

102.  Sendo assim, a tecnologia reivindicada na patente BR102012027259-8 não encontra correspondência no padrão H.265/HEVC.

33

**DANNEMANN**
**SIEMSEN**

## V.3.B – DA NÃO-ESSENCIALIDADE DA PATENTE BR102012027968-1 PARA O PADRÃO H.265/HEVC

103.    A patente BR102012027968-1, intitulada "Método de reconstrução de sinalizadores de coeficientes significativos e decodificador para decodificação de um fluxo de bits de dados codificados", descreve métodos e dispositivos para codificação e decodificação de vídeo utilizando mapas de significância de nível múltiplo, aplicados principalmente a unidades de transformação de tamanhos maiores, como 16×16 e 32×32, visando reduzir a complexidade do processo de codificação por entropia.

104.    A suposta invenção proposta na patente BR102012027968-1 é definida por suas características-chave na sua reivindicação 1, reproduzida abaixo:

> **Reivindicação 1 de BR102012027968-1**
>
> *"1. Método de reconstrução de sinalizadores de coeficientes significativos para uma unidade de transformação a partir de um fluxo de bits de dados codificados, o método caracterizado pelo fato de que compreende:*
> *reconstruir sinalizadores de grupos de coeficientes significativos, em que a unidade de transformação é particionada em blocos não sobrepostos, cada bloco contendo um grupo respectivo de sinalizadores de coeficientes significativos e em que cada sinalizador de grupo de coeficientes significativos corresponde a um respectivo bloco e seu grupo respectivo sinalizador de coeficientes significativos; e*
> *reconstruir cada sinalizador de coeficientes significativos mediante se o sinalizador de coeficientes significativos estiver na posição (0,0) em seu grupo, um sinalizador de grupo de coeficientes significativos correspondente for diferente de zero, o grupo não será o bloco DC e todos os sinalizadores de coeficiente significativo anteriores nesse grupo são zero, inferindo-se que o sinalizador de coeficientes significativos na posição (0,0) nesse grupo é 1*
> *e, de outra forma,*
> *decodificação do sinalizador de coeficientes significativos a partir do fluxo de bits se aquele sinalizador de coeficientes significativos estiver em um grupo que tenha um correspondente sinalizador de grupo de coeficientes significativos que não seja zero, e*
> *fixação do sinalizador de coeficientes significativos em zero, se aquele sinalizador de coeficientes significativos estiver em um grupo que tenha um correspondente sinalizador de grupo de coeficientes significativos que seja zero."*

105.    Todavia, como esclarece o Prof. Gustavo Fraidenraich em sua nota técnica, a tecnologia reivindicada na patente BR102012027968-1 difere das determinações normativas do padrão H.265/HEVC por diversos motivos.

34

**DANNEMANN**
**SIEMSEN**

106.  Por exemplo, a reivindicação exige a "reconstrução de **cada** indicador de coeficiente significativo" por meio de um de três caminhos <u>exclusivos</u>. No entanto, como explica o Prof. Gustavo Fraidenraich, o H.265/HEVC não segue essa estrutura, mas possui caminhos adicionais para reconstruir os indicadores de coeficientes significativos:

> **Prof. Gustavo Fraidenraich:**
> *"A reivindicação 1 da patente exige a "reconstrução de **cada** sinalizador de coeficiente significativo" por um de três caminhos <u>exclusivos</u>:*
>
> *(1)     a inferência (0,0) (1[c]); e*
>
> ***Caso contrário,***
>
> ***(2)** se o sinalizador de grupo for 1, o sinalizador de coeficiente significativo é decodificado a partir do fluxo de bits (1[e]); ou*
>
> ***(3)** se o sinalizador de grupo for 0, o sinalizador de coeficiente significativo é definido como zero (1[f]).*
>
> *Todavia, o H.265 não segue essa estrutura, mas possui caminhos adicionais para reconstruir um sinalizador de coeficiente significativo. Abaixo estão dois exemplos:*
>
> *•          Se uma posição de coeficiente corresponde ao último coeficiente significativo na ordem de varredura ((LastSignificantCoeffX, LastSignificantCoeffY)), o decodificador infere que o sig_coeff_flag é 1. Essa inferência se aplica independentemente de o coeficiente estar na posição (0,0) ou em qualquer outro ponto do sub-bloco. Isso é diferente da reivindicação 1 da BR 968. Por exemplo, se o coeficiente corresponde ao último coeficiente significativo na ordem de varredura e não está em (0,0), como o sinalizador de grupo para o sub-bloco que contém o último coeficiente significativo é sempre inferido como 1 no H.265, a reivindicação 1 exige que o sinalizador de coeficiente significativo seja decodificado a partir do bitstream, mas o padrão H.265 sempre inferiria tal sinalizador como 1.*
>
> *•     Se um coeficiente estiver no lastSubBlock, que é o sub-bloco contendo o último coeficiente significativo, e estiver posicionado após o último coeficiente significativo (n > lastScanPos), um decodificador compatível com H.265 infere que os sig_coeff_flags de todos esses coeficientes são "0". Isso novamente difere da Reivindicação 1, que exige que tais sinalizadores de coeficientes significativos sejam decodificados a partir do fluxo de bits, uma vez que esses coeficientes não podem estar na posição (0,0) (pois são coeficientes posteriores ao último coeficiente significativo, sendo, no melhor caso, o segundo coeficiente do sub-bloco) e fariam parte do sub-bloco com sinalizador de grupo igual a 1 (o lastSubBlock sempre possui sinalizador de grupo igual a 1).."*

35

**DANNEMANN**
**SIEMSEN**

107. O exemplo apresentado acima é apenas um dentre outras diferenças identificadas pelo especialista consultado pela BYTEDANCE entre a tecnologia reivindicada na patente e o padrão H.265/HEVC. Sendo assim, a tecnologia reivindicada na patente BR102012027968-1 não encontra correspondência no padrão H.265/HEVC.

## V.3.C – DA NÃO-ESSENCIALIDADE DA PATENTE BR102012029413-3 PARA O PADRÃO H.265/HEVC

108. A patente BR102012029413-3, intitulada "Método e decodificador para reconstruir indicadores de coeficiente significativo para uma unidade de transformada", se refere a métodos de codificação e decodificação de vídeo que utilizam mapas de significância de múltiplos níveis. Os coeficientes significativos são organizados em grupos contíguos, e cada grupo possui um indicador que revela se há ou não coeficientes diferentes de zero naquele agrupamento. A solução propõe uma ordem de varredura multinível, na qual a análise ocorre primeiro entre os grupos e, depois, dentro de cada grupo. O fluxo de bits pode intercalar indicadores de grupo e indicadores individuais de coeficientes, permitindo um processo de codificação mais eficiente. Essa abordagem, supostamente, melhora a organização dos dados residuais e potencialmente otimiza o desempenho de codificação em padrões modernos de vídeo.

109. A reivindicação 1 da patente é reproduzida abaixo, definindo as características-chave daquele método proposto na patente:

> **Reivindicação 1 de BR102012029413-3:**
>
> *"1. Método, em um decodificador, de reconstruir indicadores de coeficiente significativo para uma unidade de transformada, em que a unidade transformada compreende blocos de não sobreposição de coeficientes de transformada, cada um dos blocos de não sobreposição corresponde a um grupo respectivo de indicadores de coeficiente significativo, cada indicador de coeficiente significativo corresponde a um coeficiente de transformada respectivo e cada respectivo grupo corresponde a um respectivo grupo de indicador de coeficiente significativo, grupos de indicadores de coeficiente significativo são reconstruídos em uma ordem de varredura de grupo, e indicadores de coeficiente significativo são reconstruídos em uma ordem de varredura*

36

*dentro de seus grupos, o método caracterizado pelo fato de que compreende:*

*decodificar uma posição para um último coeficiente significativo da unidade de transformada a partir de um fluxo de bits de dados codificados;*

*em um primeiro grupo correspondente à posição do último coeficiente significativo, decodificar a partir do fluxo de bits cada indicador de coeficiente significativo na ordem de varredura a partir de uma posição seguindo a posição do último coeficiente significativo na ordem de varredura através da posição (0,0) do primeiro grupo;*

*para cada grupo na ordem de varredura de grupo a partir de um segundo grupo, o qual segue o primeiro grupo na ordem de varredura de grupo, a um grupo que precede um grupo DC na ordem de varredura de grupo, em que o grupo DC corresponde a um bloco contendo um coeficiente de transformada na posição (0,0) da unidade de transformada,*

*decodificar um indicador de grupo de coeficiente significativo a partir do fluxo de bits para esse grupo, e*

*reconstruir os indicadores de coeficiente significativo naquele grupo em uma ordem de varredura naquele grupo, por, para cada indicador de coeficiente significativo naquele grupo,*

*se esse indicador de grupo de coeficiente significativo está na posição (0,0) naquele grupo, o seu indicador de grupo de coeficiente significativo correspondente é decodificado para ser não zero, e todos os indicadores de coeficiente significativo que precedem esse indicador de coeficiente significativo na ordem de varredura nesse grupo são zero, e então inferir, sem decodificar do fluxo de bits, que esse indicador de coeficiente significativo seja 1, e*

*de outra forma*

*decodificar esse indicador de coeficiente significativo do fluxo de bits se esse indicador de coeficiente significativo estiver em um grupo que tenha um indicador de grupo de coeficiente significativo correspondente que seja não zero, e*

*inferir, sem decodificar do fluxo de bits, esse indicador de coeficiente significativo para zero, se esse indicador de coeficiente significativo estiver em um grupo que tenha um indicador de grupo de coeficiente significativo correspondente que seja zero; e*

*no grupo DC, decodificar cada indicador de coeficiente significativo correspondente na ordem de varredura."*

110.   Entretanto, como explica o Prof. Gustavo Fraidenraich em sua nota técnica, as características-chave dessa reivindicação não são lidas no padrão H.265/HEVC.

111.   A título de exemplo, o Prof. Gustavo Fraidenraich esclarece que a reivindicação exige que o grupo DC corresponda ao bloco contendo o coeficiente de posição (0,0) da unidade de transformada, mas que o H.265/HEVC não contempla esse conceito:

**Prof. Gustavo Fraidenraich:**

dannemann.com.br

**DANNEMANN**
**SIEMSEN**

> *"O padrão H.265 não satisfaz a limitação 1[c], pois a reivindicação exige que o grupo DC corresponda ao bloco que contém o coeficiente na posição (0,0) da **transform unit**. No H.265, não existe tal arranjo único de coeficientes: cada bloco de transformada possui seu próprio coeficiente na posição (0,0), o que torna impossível identificar um único grupo DC nos termos da reivindicação. Assim, o conceito de grupo DC presente na reivindicação não possui correspondência no padrão H.265, e essa diferença impede que a estrutura reivindicada seja mapeada para a arquitetura real do HEVC.".*

112.    O Prof. Gustavo Fraidenraich aponta outras diversas diferenças entre a tecnologia reivindicada e o padrão H.265/HEVC, sendo a diferença acima apenas uma dentre outras identificadas. Sendo assim, a tecnologia reivindicada na patente BR102012029413-3 não encontra correspondência no padrão H.265/HEVC.

## V.3.D – DA NÃO-ESSENCIALIDADE DA PATENTE BR102013001124-0 PARA O PADRÃO H.265/HEVC

113.    A patente BR102013001124-0, intitulada "Método de decodificar um fluxo de bits de vídeo codificado, codificador para codificar um fluxo de bits de vídeo e mídia legível por processador não transitória", descreve técnicas aplicadas à codificação e decodificação de vídeo em sistemas baseados em transformadas, como HEVC. A suposta invenção ali descrita propõe métodos para ocultar bits de sinal de coeficientes transformados, permitindo reduzir a quantidade de sinalizações explícitas no fluxo de bits. Para isso, a unidade transformada é dividida em grupos ou subconjuntos de coeficientes, e a ocultação é feita com base em critérios como número de coeficientes diferentes de zero ou paridade da soma dos valores absolutos desses coeficientes. O bit de sinal ocultado pode ser recuperado no decodificador ao avaliar a paridade dentro de cada conjunto, evitando a transmissão direta desse bit no fluxo de bits.

114.    A suposta invenção é definida por suas características-chave na reivindicação 1, reproduzida abaixo:

**Reivindicação 1 de BR102013001124-0**
> *"Método de decodificar um fluxo de bits de vídeo codificado ao reconstruir coeficientes para uma unidade transformada, o fluxo de bits codificando dois ou mais conjuntos de bits de sinal para a unidade*

dannemann.com.br



*transformada, cada conjunto de bits de sinal correspondendo a um respectivo conjunto de coeficientes para a unidade transformada, em que cada bit de sinal indica o sinal de um coeficiente diferente de zero correspondente dentro do respectivo conjunto, o método caracterizado pelo fato de que compreende:*

*para cada um dos dois ou mais conjuntos de bits de sinal, somar um valor absoluto dos coeficientes para o respectivo conjunto correspondendo a esse conjunto de bits de sinal para obter um valor de paridade; e*

*designar um sinal para um dos coeficientes dentro do respectivo conjunto com base em se o valor de paridade é par ou ímpar;*

*em que cada um dos respectivos conjuntos de coeficientes compreende dois ou mais coeficientes."*

Conforme explica o Prof. Gustavo Fraidenraich em sua nota técnica, elementos-chave da invenção, descritos na reivindicação independente nº 1, não são atendidos pelo padrão H.265/HEVC.

115.    Por exemplo, a reivindicação nº 1 da patente exige "somar um valor absoluto dos coeficientes para o respectivo conjunto correspondendo a esse conjunto de bits de sinal para obter um valor de paridade ". No entanto, como explica o Prof. Gustavo Fraidenraich em sua nota técnica, o H.265/HEVC não atende a essa limitação da reivindicação.

> **Prof. Gustavo Fraidenraich:**
> *"A limitação 1[b] exige "somar um valor absoluto dos coeficientes para o respectivo conjunto correspondendo a esse conjunto de bits de sinal para obter um valor de paridade;". O preâmbulo afirma explicitamente que "cada conjunto de bits de sinal correspondendo a um respectivo conjunto de coeficientes para a unidade transformada, em que cada bit de sinal indica o sinal de um coeficiente diferente de zero correspondente dentro do respectivo conjunto". Uma leitura razoável do preâmbulo é que "respectivo conjunto" de coeficientes é mais amplo do que o subconjunto de coeficientes não nulos com bits de sinal correspondentes. Sob essa interpretação, a expressão "dos coeficientes para o respectivo conjunto", na limitação 1[b], refere-se a todos os coeficientes dentro do respectivo conjunto, incluindo coeficientes que são zero. Portanto, a limitação 1[b] exige a soma de todos os coeficientes dentro do respectivo conjunto correspondente a um conjunto de bits de sinal. O HEVC/H.265 não faz isso. No mecanismo de ocultação do bit de sinal no HEVC/H.265, o cálculo da paridade é realizado apenas sobre coeficientes não nulos que possuem bits de sinal correspondentes, excluindo os coeficientes zero. Como o HEVC/H.265 soma menos coeficientes do que o conjunto completo referido na limitação 1[b], ele não atende à limitação 1[b]."*

dannemann.com.br

**DANNEMANN SIEMSEN**

116.  O Prof. Gustavo Fraidenraich aponta outra diferença entre a tecnologia reivindicada em sua nota técnica. Portanto, a tecnologia reivindicada na patente BR102013001124-0 não corresponde ao padrão H.265/HEVC.

## V.3.E – DA NÃO-ESSENCIALIDADE DA PATENTE BR102013001517-2 PARA O PADRÃO H.265/HEVC

117.  A patente BR 10 2013 001517-2, intitulada "Métodos e dispositivos para seleção de conjunto de contextos", descreve técnicas para selecionar conjuntos de contextos empregados na codificação e decodificação de mapas de significância de múltiplos níveis dentro de unidades de transformada de diferentes tamanhos. O método supostamente permite que diferentes regiões da unidade de transformada utilizem conjuntos de contextos distintos, seja de forma fixa, com regiões predefinidas, seja de forma dinâmica, em que o codificador e o decodificador determinam a qual região cada grupo de coeficientes pertence.

118.  A reivindicação 1 da referida patente, que define as características-chave da solução proposta, é reproduzida abaixo:

**Reivindicação 1 de BR102013001517-2**

*"1. Método de decodificar um fluxo de bits de vídeo codificado por reconstruir indicadores de coeficiente significativo para uma unidade de transformada, a unidade de transformada compreendendo uma seqüência de blocos, o fluxo de bits codificando conjuntos de indicadores de coeficiente significativo, cada conjunto correspondendo a um bloco respectivo, os blocos da unidade de transformada sendo processados em uma ordem de escaneamento, o método sendo caracterizado pelo fato de que compreende:*
*- i) para um conjunto de indicadores de coeficiente significativo correspondendo a um primeiro bloco, selecionar um conjunto de contextos de uma pluralidade de conjuntos de contextos para uso na decodificação de indicadores de coeficiente significativo daquele conjunto baseado em um indicador de grupo de coeficiente significativo associado a um bloco à direita do primeiro bloco e um indicador de grupo de coeficiente significativo associado a um bloco abaixo do primeiro bloco;*
*- ii) decodificar por entropia os indicadores de coeficiente significativo daquele conjunto utilizando o conjunto de contexto selecionado; e*
*- iii) mover para o próximo bloco na ordem de escaneamento e retornar a etapa i),*

**DANNEMANN SIEMSEN**

*- em que cada indicador de grupo de coeficiente significativo indica se seu bloco associado é presumido a conter pelo menos um indicador de coeficiente significativo diferente de zero; e*
*- em que se o indicador de grupo de coeficiente significativo é zero, então não existe indicador de coeficiente significativo diferente de zero no bloco,*
*- e se o indicador de grupo de coeficiente significativo é diferente de zero, então existe pelo menos um indicador de coeficiente significativo diferente de zero no bloco; e*
*- em que a decodificação por entropia compreende decodificação de contexto adaptativo, e em que o conjunto de contextos identifica os contextos a serem usados na decodificação adaptativa de contexto dos indicadores de coeficiente significativo do conjunto de indicadores de coeficiente significativo,*
*- em que selecionar um conjunto de contexto compreende selecionar um primeiro conjunto de contexto se ambos os indicadores de grupo de coeficiente significativo são diferentes de zero e, do contrário, selecionar um conjunto de contexto diferente e mutuamente exclusivo;*
*- em que, se o indicador de grupo de coeficiente significativo do primeiro bloco é zero, então ajustar todos os indicadores de grupo de coeficiente significativo no primeiro bloco para zero, ao invés de realizar a etapa de seleção e a etapa de decodificação por entropia."*

119.  A análise realizada pelo Prof. Gustavo Fraidenraich demonstra, entretanto, que certas características da reivindicação 1 da patente não encontram correspondente no padrão H.265/HEVC. Por exemplo, a reivindicação 1 impõe uma regra de decisão estritamente binária para selecionar um conjunto de contexto, onde o decodificador escolhe um de dois conjuntos de contexto mutuamente exclusivos, dependendo se os indicadores de grupo dos blocos vizinhos são diferentes de zero, enquanto o H.265/HEVC não opera de acordo com essa regra:

> **Prof. Gustavo Fraidenraich:**
> *"Em qualquer uma dessas interpretações, ainda que se admita, para fins de argumentação, que as quatro regras computacionais possam ser mapeadas para múltiplos conjuntos de contextos, o H.265 ainda assim não satisfaz os requisitos de decisão binária. Mesmo aplicando as quatro regras computacionais acima para derivar os valores de sigCtx, obtêm-se quatro cenários correspondentes a prevCsbf = 0, 1, 2 e 3. O caso prevCsbf = 3 representa a condição reivindicada em que ambos os sub-blocos vizinhos possuem sinalizadores de grupo diferentes de zero. Os casos prevCsbf = 0, 1 e 2 representam todos os demais cenários nos quais um ou ambos os vizinhos possuem sinalizadores iguais a zero. Nesse cenário, muitos dos valores de sigCtx associados ao caso prevCsbf = 3 se sobrepõem aos valores de sigCtx resultantes dos casos prevCsbf = 0, 1 ou 2. Essa sobreposição viola diretamente o requisito de "diferentes e mutuamente exclusivos" da limitação 1[h]. [...] Essa sobreposição de valores entre diferentes cenários demonstra que, mesmo que se entenda que o H.265 requer múltiplos conjuntos de*

41



> *contexto, esses conjuntos não seriam "diferentes e mutuamente exclusivos", conforme exigido pela limitação 1[h]. Portanto, o H.265 não satisfaz a limitação 1[h] sob nenhuma das interpretações analisadas."*

120.   À luz também de outras diferenças adicionais observadas entre a reivindicação e o padrão H.265/HEVC, o Prof. Gustavo Fraidenraich conclui pela não-correspondência entre o método reivindicado e o padrão. Sendo assim, a tecnologia reivindicada na patente BR102013001517-2 não encontra correspondência no padrão H.265/HEVC.

## V.3.F – DA NÃO-ESSENCIALIDADE DA PATENTE BR122019021946-0 PARA O PADRÃO H.265/HEVC

121.   A patente BR122019021946-0, cujo título é "Dispositivo de codificação de imagem para codificar imagens de entrada e dispositivo de decodificação de imagem para decodificar dados de imagens codificados", é uma divisão da patente PI0813904-0 também aqui abordada. Esta patente BR122019021946-0 trata de técnicas de codificação e decodificação de imagens, propondo um dispositivo capaz de selecionar conjuntos de predição e modos de predição mais adequados à estrutura de bordas e características espaciais da imagem. O objetivo é, supostamente, melhorar a eficiência da predição *intraframe*, reduzindo a quantidade de dados residuais e, consequentemente, a taxa de bits necessária para representar a imagem codificada. A solução amplia a variedade de ângulos e combinações de predição disponíveis, superando limitações dos métodos tradicionais que utilizam apenas nove direções fixas.

122.   As características-chave para realização da suposta invenção proposta na patente podem ser lidas nas suas reivindicações 1 e 2 (que definem, respectivamente, um codificador e um decodificado), reproduzidas abaixo:

### Reivindicação 1 de BR122019021946-0

> *"1. Dispositivo de codificação (encoding) de imagem (100, 200, 500, 600, 700) para codificar (encoding) uma imagem de entrada, CARACTERIZADO pelo fato de que compreende:*

42



*meios de subdivisão para subdividir uma unidade predeterminada contida em uma sequência de imagens de entrada em unidades de codificação;*

*primeiros meios de seleção (13, 213) para selecionar um conjunto de predição por unidade de codificação em uma unidade predeterminada a partir de um grupo de conjuntos de predição, incluindo uma pluralidade de conjuntos de predição, cada conjunto de predição compreendendo uma combinação diferente de modos de predição e compreendendo um mesmo número de modos de predição, incluindo pelo menos um modo de predição direcional;*

*segundos meios de seleção (11, 211, 311) para selecionar um modo de predição por unidade de codificação em uma unidade predeterminada a partir de uma pluralidade de modos de predição incluídos no conjunto de predição selecionado pelos primeiros meios de seleção para a unidade de codificação em uma unidade predeterminada;*

*meios de intrapredição (10, 210, 310, 710) para formar uma imagem submetida à intrapredição por unidade de codificação, através da utilização*
do modo de predição selecionado para a unidade de codificação; e

*meios de codificação (4, 204, 304, 504) para codificar dados residuais entre a imagem de entrada e uma imagem submetida à intrapredição, e para codificar o modo de predição selecionado por unidade de codificação,*

*em que a codificação do modo de predição selecionado por unidade de codificação compreende codificar um índice de combinação de direções de referência usando codificação de comprimento variável."*

**Reivindicação 2 de BR122019021946-0**

*"2. Dispositivo de decodificação de imagens (150, 250, 350, 550, 650, 750) para decodificar dados codificados de imagens, CARACTERIZADO por uma sequência de imagens sendo dividida em unidades predeterminadas, cada unidade predeterminada sendo dividida em unidades de decodificação, o dispositivo de decodificação de imagens (150, 250, 350, 550, 650, 750) compreendendo:*

*meios de decodificação (5, 205, 305, 505) para i) decidir, a partir dos dados codificados (encoded), um conjunto de predição por unidade de decodificação em uma unidade predeterminada de acordo com um grupo de conjuntos de predição, incluindo uma pluralidade de conjuntos de predição, cada conjunto de predição compreendendo uma combinação diferente de modos de predição e compreendendo um mesmo número de modos de predição, incluindo pelo menos um modo de predição direcional, e ii) decodificar um modo de predição e dados residuais cada um por unidade de decodificação incluída em uma unidade predeterminada;*

*meios de intrapredição (10, 201, 310, 710) para formar uma imagem submetida à intrapredição por unidade de decodificação, através da utilização do modo de predição assim decodificado por unidade de decodificação; e*

*meios de adição (8) para adicionar os dados residuais assim decodificados por unidade de decodificação e a imagem submetida a predição assim formada por unidade de decodificação,*

*em que a decodificação do modo de predição selecionado por unidade de decodificação compreende decodificar um índice de*

43

DANNEMANN
SIEMSEN

*combinação de direções de referência usando codificação de comprimento variável."*

123.   Entretanto, após uma análise criteriosa, o Prof. Gustavo Fraidenraich identificou múltiplas diferenças entre os objetos reivindicados na patente e o padrão H.265/HEVC. A título de exemplo, e como explica o Prof. Gustavo Fraidenraich em sua nota técnica, enquanto as reivindicações 1 e 2 da patente exigem a presença de um "um **grupo** de conjuntos de predição, incluindo uma **pluralidade** de conjuntos de predição", o padrão H.265/HEVC define um único conjunto fixo:

> **Prof. Gustavo Fraidenraich:**
> *"Embora a Seção 8.4.2 do padrão H.265 descreva uma lista de modos candidatos ("candModeList") que pode ser preenchida com diferentes conteúdos, esta lista não é um "grupo" de conjuntos de predição nem uma "pluralidade" de conjuntos de predição. Em uma interpretação forçosa, e por mera hipótese, poder-se-ia considerar este "candModeList" como um único conjunto de predição, mas nunca como um "grupo" de conjuntos de predição nem como uma "pluralidade" de conjuntos de predição como exige as reivindicações das patentes aqui analisadas."*

124.   Em outro exemplo referente à reivindicação 2, a reivindicação define que "decodificar o modo de predição selecionado por unidade de decodificação" compreende "**decodificar um _índice_ de combinação de direção de referência usando codificação de comprimento variável**".   Como explica o Prof. Gustavo Fraidenraich, no H.265/HEVC não é encontrado nenhum índice desse tipo:

> **Prof. Gustavo Fraidenraich:**
> *"A reivindicação 2 da patente BR122019021946-0 define a característica: "em que decodificar o modo de predição selecionado por unidade de decodificação compreende decodificar um índice de combinação de direção de referência usando codificação de comprimento variável." O relatório descritivo da patente em questão define esse índice como um índice atribuído a uma combinação de direções de referência dos grupos de sub-blocos B1 a B4 (vide figura 33 da patente). Nenhum índice desse tipo é encontrado no padrão H.265.".*

125.   Sendo assim, a tecnologia reivindicada na patente BR122019021946-0 não encontra correspondência no padrão H.265/HEVC.

**V.3.G – DA NÃO-ESSENCIALIDADE DA PATENTE PI0813904-0 PARA O PADRÃO H.265/HEVC**

**DANNEMANN**
**SIEMSEN**

126.   Como indicado anteriormente, a patente PI0813904-0 deu origem à patente dividida BR122019021946-0, abordada na seção anterior. As reivindicações 1 e 2 da patente PI0813904-0 e da patente BR122019021946-0 são comparadas abaixo, com a principal diferença entre estas reivindicações sendo a limitação adicional destacada:

| PI0813904-0 | BR122019021946-0 |
|---|---|
| **Reivindicação 1:** | **Reivindicação 1:** |
| 1. Dispositivo de codificação (encoding) de imagem (100, 200, 500, 600, 700) para codificar (encoding) imagens de entrada, CARACTERIZADO pelo fato de que compreende: | 1. Dispositivo de codificação (encoding) de imagem (100, 200, 500, 600, 700) para codificar (encoding) uma imagem de entrada, CARACTERIZADO pelo fato de que compreende: |
| meios de subdivisão para subdividir uma unidade pré-determinada contida em uma sequência das imagens de entrada em unidades de codificação; | meios de subdivisão para subdividir uma unidade predeterminada contida em uma sequência de imagens de entrada em unidades de codificação; |
| primeiros meios de seleção (13, 213) para selecionar um conjunto de predição por unidade de codificação em uma unidade pré-determinada a partir de um grupo de conjuntos de predição incluindo uma pluralidade de conjuntos de predição, cada um incluindo uma pluralidade de diferentes modos de predição correspondendo às respectivas direções de predição e aos respectivos métodos de predição; | primeiros meios de seleção (13, 213) para selecionar um conjunto de predição por unidade de codificação em uma unidade predeterminada a partir de um grupo de conjuntos de predição, incluindo uma pluralidade de conjuntos de predição, cada conjunto de predição compreendendo uma combinação diferente de modos de predição e compreendendo um mesmo número de modos de predição, incluindo pelo menos um modo de predição direcional; |
| segundos meio de seleção (11, 211, 311) para selecionar um modo de predição por unidade de codificação em uma unidade pré-determinada, a partir de uma pluralidade de modos de predição | segundos meios de seleção (11, 211, 311) para selecionar um modo de predição por unidade de codificação em uma unidade predeterminada a partir de uma |

| | |
|---|---|
| incluídos em um conjunto de predição selecionado pelo primeiro meio de seleção para a unidade de codificação em uma unidade predeterminada;<br><br>meios de intrapredição (10, 210, 310, 710) para formar uma imagem 20 submetida ao intrapredição por unidade de codificação pelo uso do conjunto de predição selecionado e o modo de predição selecionado para a unidade de codificação; e<br><br>meios de codificação (4, 204, 304, 504) para codificar dados residuais entre a imagem de entrada e uma imagem submetida ao intrapredição, e o modo de predição selecionado por unidade de codificação. | pluralidade de modos de predição incluídos no conjunto de predição selecionado pelos primeiros meios de seleção para a unidade de codificação em uma unidade predeterminada;<br><br>meios de intrapredição (10, 210, 310, 710) para formar uma imagem submetida à intrapredição por unidade de codificação, através da utilização do modo de predição selecionado para a unidade de codificação; e<br><br>meios de codificação (4, 204, 304, 504) para codificar dados residuais entre a imagem de entrada e uma imagem submetida à intrapredição, e para codificar o modo de predição selecionado por unidade de codificação,<br><br><u>em que a codificação do modo de predição selecionado por unidade de codificação compreende codificar um índice de combinação de direções de referência usando codificação de comprimento variável.</u> |
| **Reivindicação 2:**<br><br>2. Dispositivo de decodificação de imagem (150, 250, 350, 550, 650, 750) para decodificar dados de imagens codificados, uma sequência de imagens sendo divida em unidades prédeterminadas, cada unidade pré determinada sendo dividida em unidades de decodificação, o dispositivo de 30 codificação de imagem (150, 250, 350, | **Reivindicação 2:**<br><br>2. Dispositivo de decodificação de imagens (150, 250, 350, 550, 650, 750) para decodificar dados codificados de imagens, CARACTERIZADO por uma sequência de imagens sendo dividida em unidades predeterminadas, cada unidade predeterminada sendo dividida em unidades de decodificação, o dispositivo |

**DANNEMANN**
**SIEMSEN**

550, 650, 750) CARACTERIZADO pelo fato de que compreende:

meios de decodificação para (i) decidir, a partir do dado codificado, um conjunto de predição por unidade decodificada em uma unidade pré determinada de acordo com um grupo de conjuntos de predição incluindo uma pluralidade de conjunto de predição, cada um incluindo uma pluralidade de modos de predição correspondente à diferentes direções de predição e diferentes métodos de predição, e (ii) decodificar um modo de predição e dado residual, cada um por unidade de decodificação incluídos em uma unidade pré determinada;

meios de intrapredição (10, 201, 310, 710) para formar uma imagem submetida ao intrapredição por unidade de decodificação pela utilização de um conjunto de predição e o modo de predição assim decodificado por unidade de decodificação; e

meios de adição para adicionar o dado residual assim decodificado por unidade de decodificação e a imagem submetida a predição assim formada pela unidade de decodificação.

de decodificação de imagens (150, 250, 350, 550, 650, 750) compreendendo:

meios de decodificação (5, 205, 305, 505) para i) decidir, a partir dos dados codificados (encoded), um conjunto de predição por unidade de decodificação em uma unidade predeterminada de acordo com um grupo de conjuntos de predição, cada conjunto de predição compreendendo uma combinação diferente de modos de predição e compreendendo um mesmo número de modos de predição, incluindo pelo menos um modo de predição direcional, e ii) decodificar um modo de predição e dados residuais cada um por unidade de decodificação incluída em uma unidade predeterminada;

meios de intrapredição (10, 201, 310, 710) para formar uma imagem submetida à intrapredição por unidade de decodificação, através da utilização do modo de predição assim decodificado por unidade de decodificação; e

meios de adição (8) para adicionar os dados residuais assim decodificados por unidade de decodificação e a imagem submetida a predição assim formada por unidade de decodificação,

em que a decodificação do modo de predição selecionado por unidade de decodificação compreende decodificar um

dannemann.com.br

DANNEMANN
SIEMSEN

| | índice de combinação de direções de referência usando codificação de comprimento variável. |
|---|---|

127.   Inicialmente, cabe ressaltar que a patente divisional BR122019021946-0 é **nula** por incorrer em dupla-patenteabilidade à luz da matéria reivindicada na patente-mãe PI0813904-0. Isto porque as Diretrizes de Exame do INPI[21] proíbem que a divisão de um pedido de patente venha a proteger matéria meramente mais limitada que a matéria já protegida no pedido-mãe, já que o escopo do pedido mãe já abarcaria a matéria do pedido dividido, resultando em dupla proteção.

128.   De todo modo, considerando que o escopo da patente BR122019021946-0 é meramente mais limitado que aquele da patente PI0813904-0, as considerações de não-correspondência da invenção reivindicada em relação ao padrão H.265/HEVC apresentadas anteriormente (e na nota técnica do Prof. Gustavo Fraidenraich) para a patente BR122019021946-0 também se aplicam, *mutatis mutandis*, à patente PI0813904-0, com exceção da consideração relacionada ao "índice', a qual consta na limitação adicional vista nas reivindicações da patente BR122019021946-0.

129.   No mais, o Prof. Gustavo Fraidenraich ainda comenta sobre um problema de clareza da reivindicação 2 da PI0813904-0, que resulta em duas possíveis interpretações diferentes de seu escopo, sendo que, em qualquer uma destas interpretações, o padrão H.265/AVC permanece diferindo do que é reivindicado:

> **Prof. Gustavo Fraidenraich:**
> *Nota-se que não está claro se o trecho "cada um incluindo uma pluralidade de modos de predição correspondente à diferentes direções de predição e diferentes métodos de predição" exige que cada modo de predição no conjunto de predições corresponda a uma direção diferente ou que cada conjunto de previsões, como um todo, corresponda a uma direção de previsão diferente.*
>
> *Recorrendo ao contexto da tecnologia descrita na patente, a alegada novidade da patente PI0813904-0 pode ser entendida como sendo a utilização de uma pluralidade de conjuntos de predição, em que cada*

---

[21] **Portaria INPI/DIRPA nº 16/2024: Item 3.14**2: No caso de um pedido dividido reivindicar uma matéria mais específica que a do pedido original do qual decorre, na ocasião do exame técnico deste pedido dividido, o mesmo deve ser indeferido por não atender ao disposto no artigo 6º da LPI uma vez que implica em dupla proteção, tendo em vista que a matéria mais ampla reivindicada no pedido original já abrange o detalhamento reivindicado no pedido dividido.

**DANNEMANN**
**SIEMSEN**

*conjunto de predição é otimizado para predição numa direção diferente. Este entendimento é corroborado, por exemplo, pelo fato de que a patente PI0813904-0 fornece exemplos de "conjuntos de previsão 0 a 3" na Fig. 6, em que cada conjunto de previsão é utilizado para previsão numa direção diferente.*

*Neste sentido, caso seja assumido, por mera hipótese, que cada modo de predição no conjunto de predições corresponda a uma direção diferente, uma candModeList potencial não inclui uma pluralidade de modos de predição correspondentes a diferentes direções de predição.*

*[...]*

*De outra forma, se for assumido, por mera hipótese, que cada conjunto de previsões, como um todo, corresponda a uma direção de predição diferente, o candModeList no padrão H.265 não é otimizado para predição com base em uma direção específica."*

130.    Por este motivo e outros indicados em sua Nota Técnica, conclui o Prof. Gustavo Fraidenraich pela não correspondência entre a patente PI0813904-0 e o referido padrão. Sendo assim, a tecnologia reivindicada na patente PI0813904-0 não encontra correspondência no padrão H.265/HEVC.

## V.3.H – DA NÃO-ESSENCIALIDADE DA PATENTE BR112013007383-7 PARA O PADRÃO H.265/HEVC

131.    A patente BR112013007383-7, intitulada "Método e aparelho para decodificar um fluxo de bits de vídeo", situa-se no campo da codificação e decodificação de vídeo, abordando especialmente técnicas que permitem inicializar e operar decodificadores de entropia em ambientes de processamento paralelo. O documento descreve limitações dos padrões existentes, como o H.264/AVC, que apresentam gargalos na etapa de decodificação por entropia devido à dependência serial entre símbolos. Para supostamente superar esse problema, a patente propõe o conceito de fatias de entropia, que permitem particionar uma mesma fatia de reconstrução em múltiplas subfatias independentes, viabilizando a decodificação paralela.

132.    A reivindicação 1 da patente, que define as características-chave para reprodução da suposta invenção ali descrita, é reproduzida abaixo:

**Reivindicação 1**

49

**DANNEMANN**
**SIEMSEN**

> *"Método para decodificar um fluxo de bits de vídeo, CARACTERIZADO pelo fato de que compreende:*
>
> *decodificar, em um cabeçalho de fatia associado a uma imagem, um primeiro elemento de sintaxe com um valor inteiro indicando um número dentre uma pluralidade de fatias de entropia definindo uma primeira fatia, em que cada uma das fatias de entropia contém uma pluralidade de maiores unidades de codificação (LCUs);*
>
> *decodificar um segundo elemento de sintaxe no cabeçalho da fatia indicando um deslocamento com um índice i, em que o índice i tem como intervalo de 0 ao valor inteiro do primeiro elemento de sintaxe menos 1 e o deslocamento indica, em uma unidade de bytes, uma distância entre (i) uma fatia de entropia dentre a pluralidade de fatias de entropia na primeira fatia no fluxo de bits de vídeo e (ii) uma fatia de entropia que precede a uma fatia de entropia dentre a pluralidade de fatias de entropia no fluxo de bits de vídeo;*
>
> *decodificar um terceiro elemento de sintaxe no cabeçalho de fatia indicando um tipo de fatia da primeira fatia;*
>
> *em circunstâncias onde o terceiro elemento de sintaxe indica que o tipo de fatia da primeira fatia é uma fatia B, decodificar um sinalizador no cabeçalho de fatia indicando um método de inicialização de um contexto de Codificação Aritmética Binária Adaptativa Contextual (CABAC), em que*
>
> *em circunstâncias onde o sinalizador decodificado indica um primeiro valor, inicializar o contexto CABAC usando um primeiro método de inicialização na primeira LCU de cada fatia de entropia dentre a pluralidade de fatias de entropia na fatia B, e*
>
> *em circunstâncias onde o sinalizador decodificado indica um segundo valor, inicializar o contexto CABAC utilizando um segundo método de inicialização na primeira LCU de cada fatia de entropia dentre a pluralidade de fatias de entropia na fatia B;*
>
> *em circunstâncias onde o terceiro elemento de sintaxe indica o tipo de fatia da primeira fatia é uma fatia P, inicializar o contexto CABAC usando um método de inicialização dentre os primeiro e segundo métodos de inicialização na primeira LCU de cada fatia de entropia dentre a pluralidade de fatias de entropia na fatia P; e*
>
> *em circunstâncias onde o terceiro elemento de sintaxe indica o tipo de fatia da primeira fatia é uma fatia I, inicializar o contexto CABAC utilizando um terceiro método de inicialização na primeira LCU de cada fatia de entropia dentre a pluralidade de fatias de entropia na fatia I, em que o terceiro método de inicialização é diferente do primeiro método de inicialização e do segundo método de inicialização."*

133.    Entretanto, o Prof. Gustavo Fraidenraich conclui, em sua nota técnica, que não há correspondência entre a matéria reivindicada e o padrão H.265. A título de exemplo, a reivindicação exige um elemento sintático no cabeçalho de fatia que *"indica um número entre uma pluralidade de fatias de entropia que definem uma primeira fatia"*, enquanto o padrão H.265 não opera dessa forma:

**Prof. Gustavo Fraidenraich:**

50

DANNEMANN
SIEMSEN

*"O H.265 não revela literalmente um elemento sintático no cabeçalho do fatia que "indica um número entre uma pluralidade de fatias de entropia que definem uma primeira fatia", como exigido pela limitação 1[a]. O elemento sintático que poderia ser, em mera hipótese, considerado mais próximo a esta limitação no H.265 é o num_entry_point_offsets, que fornece o número de campos entry_point_offset_minus1[i] no cabeçalho do segmento de fatia. Assumindo, apenas para fins de argumentação, que os segmentos de fatia do H.265 correspondem à "primeira fatia" reivindicada e que os subconjuntos do segmento de fatia do H.265 correspondem às "fatias de entropia" reivindicadas, o H.265 ainda assim apenas sinaliza o número de deslocamentos em um segmento de fatia, e não o número de subconjuntos em si. Na melhor das hipóteses, o número de subconjuntos em um segmento deve ser inferido como num_entry_point_offsets + 1, o que significa que o valor indicado no cabeçalho por num_entry_point_offsets no H.265 está deslocado em uma unidade em relação ao número reivindicado e não indica literalmente o número de subconjuntos em um segmento. (H.265 v4, 7.4.7.1, p.98). Assim, o requisito literal da reivindicação não é atendido."*

134.    Por este e por outros motivos elencados em sua nota técnica que demonstram a diferença entre a matéria reivindicada e o padrão H.265/HEVC, o Prof. Gustavo Fraidenraich conclui que o referido padrão não implementa a tecnologia da patente. Sendo assim, a tecnologia reivindicada na patente BR112013007383-7 não encontra correspondência no padrão H.265/HEVC.

## V.3.I – DA NÃO-ESSENCIALIDADE DA PATENTE BR112014011334-3 PARA O PADRÃO H.265/HEVC

135.    A patente BR112014011334-3, intitulada "Método para decodificar um quadro de vídeo", situa-se no campo da codificação e decodificação de vídeo, particularmente em técnicas de inicialização de contexto. A patente propõe um método no qual o decodificador recebe o cabeçalho da fatia, identifica o tipo da fatia e interpreta um sinal indicador do método de inicialização, aplicando um dos três métodos possíveis para inicializar os contextos usados na decodificação de entropia.

136.    A reivindicação 1 da patente, que define as características-chave para a reprodução da alegada invenção, é reproduzida abaixo:

**Reivindicação 1 de BR112014011334-3:**

51

**DANNEMANN**
**SIEMSEN**

> *"1. Método para decodificar um quadro de vídeo, o método CARACTERIZADO pelo fato de que compreende:*
>> *receber um fluxo de bits de dados de vídeo codificados;*
>> *decodificar, a partir do fluxo de bits, um elemento de sintaxe indicativo de um tipo de fatia de uma fatia;*
>> *quando o tipo de fatia indica um tipo de fatia B ou um tipo de fatia P, decodificar, a partir do fluxo de bits, um sinalizador que é utilizado para determinar um método de inicialização de contexto de codificação aritmética binária adaptativa (CABAC) para o tipo de fatia B ou o tipo de fatia P; e*
>>> *inicializar um contexto CABAC associado ao tipo de fatia, em que*
>>> *em um caso que o tipo de fatia indica o tipo de fatia B e um valor do sinalizador é igual a um primeiro valor, um contexto CABAC associado ao tipo de fatia B é inicializado por um primeiro método de inicialização,*
>>> *em um caso que o tipo de fatia indica que o tipo de fatia B e o valor do sinalizador é igual a um segundo valor, um contexto CABAC associado ao tipo de fatia B é inicializado por um segundo método de inicialização,*
>>> *em um caso que o tipo de fatia indica o tipo de fatia P e o valor do sinalizador é igual ao primeiro valor, um contexto CABAC associado ao tipo de fatia P é inicializado pelo segundo método de inicialização, e*
>>> *em um caso que o tipo de fatia indica um tipo de fatia I, um contexto CABAC associado ao tipo de fatia I é inicializado por um terceiro método de inicialização."*

137.  O Prof. Gustavo Fraidenraich conclui em sua nota técnica que não há correspondência entre a matéria reivindicada e o padrão H.265. Por exemplo, o padrão H.265 não usa um dos três métodos diferentes para inicialização de contexto dependendo do tipo de fatia e do valor de um sinalizador para o tipo de fatia B ou P:

> *"As limitações 1[e]–1[h] exigem que um método de decodificação utilize um de três métodos de inicialização diferentes, dependendo do tipo de fatia e do valor de um sinalizador para fatias do tipo B ou P. Especificamente, a limitação 1[e] exige que o método de decodificação utilize um primeiro método de inicialização para uma fatia do tipo B quando o sinalizador tiver um primeiro valor. As limitações 1[f] e 1[g] exigem que o método de decodificação utilize um segundo método de inicialização para uma fatia do tipo B quando o sinalizador tiver um segundo valor ou para uma fatia do tipo P quando o sinalizador tiver um primeiro valor. A limitação 1[h] exige que o método de decodificação utilize um terceiro método de inicialização para uma fatia do tipo I. Portanto, essas limitações exigem, ao todo, três métodos de inicialização diferentes. A especificação ensina que, quando o método de inicialização é usado para determinar valores de inicialização, métodos de inicialização diferentes significam o uso de tabelas diferentes*
> *[...]*
> *O H.265 não utiliza métodos de inicialização diferentes dependendo do tipo de fatia e/ou do valor de qualquer sinalizador. Em vez disso, a especificação do H.265 afirma que "Na Tabela 9-4, os ctxIdx para os quais a inicialização é necessária para cada um dos três tipos de inicialização, especificados pela variável initType, são listados. Também*



> *é listado o número da tabela que inclui os valores de initValue necessários para a inicialização." Conforme mostrado na Tabela 9-4 (ver Figura 14) abaixo, há apenas uma única tabela associada a cada elemento sintático, independentemente do initType.*
> *[...]*
> *Em resumo, o H.265 não utiliza métodos de inicialização diferentes (isto é, tabelas) dependendo do tipo de fatia e/ou do valor de qualquer sinalizador. Assim, o H.265 não atende às limitações 1[e]–1[h]."*

138.    Sendo assim, a tecnologia reivindicada na patente BR112014011334-3 não encontra correspondência no padrão H.265/HEVC.

## V.3.J – DA NÃO-ESSENCIALIDADE DA PATENTE BR112014025292-0 PARA O PADRÃO H.265/HEVC

139.    A patente BR112014025292-0, intitulada "Dispositivo eletrônico, método e mídia não transitória legível por computador", descreve um dispositivo eletrônico equipado com processador e memória, projetado para identificar a presença de uma imagem de condução dentro de um fluxo de bits de vídeo. O sistema é capaz de codificar uma primeira imagem, determinar se há imagens que a antecedem na ordem de saída apesar de seguirem na ordem de decodificação, e gerar indicadores explícitos sobre essa condição.

140.    A reivindicação 1 da patente, que define as características-chave para reprodução da suposta invenção, é reproduzida abaixo:

**Reivindicação 1 da BR112014025292-0**

> *"1.    Dispositivo eletrônico (811), o dispositivo eletrônico CARACTERIZADO pelo fato de que compreende:*
> *pelo menos um processador (817);*
> *pelo menos uma memória (811) incluindo instruções (813a), a pelo menos uma memória (811) e as instruções (813a) configuradas para, trabalhando com o pelo menos um processador (817), fazer com que o dispositivo eletrônico (811) executar pelo menos o seguinte:*
> *codificar (302) uma imagem de atualização de decodificador instantânea, IDR, em que a imagem IDR ocorre em um ponto de acesso aleatório em um fluxo de bits de dados (1014),*
> *em que a imagem IDR inclui apenas fatias de intrapredição, fatias I, e não se refere a qualquer imagem ou imagens que não seja ela mesma para predição;*
> *quando a imagem IDR tem uma imagem principal subsequente,*

dannemann.com.br



> *gerar (306) um tipo de unidade de primeira camada de acesso à rede, NAL, da imagem IDR, indicando que a imagem IDR tem uma imagem principal subsequente, e*
> *codificar o primeiro tipo de unidade NAL; e*
> *quando a imagem de IDR não tem uma imagem de liderança subsequente,*
> *gerar (310) um segundo tipo de unidade de camada de acesso à rede, NAL, da imagem IDR indicando que a imagem IDR não tem uma imagem principal subsequente, o segundo tipo de unidade NAL sendo diferente do primeiro tipo de unidade NAL, e*
> *codificar o segundo tipo de unidade NAL,*
> *em que a imagem principal subsequente segue a imagem IDR na ordem de codificação e precede a imagem IDR em uma ordem de exibição, e em que a imagem principal subsequente é codificada sem interpredição a partir de qualquer imagem que precede a imagem IDR na ordem de codificação."*

141. Analisando a reivindicação em questão à luz das determinações do padrão H.265/HEVC, o Prof. Gustavo Fraidenraich identificou que, enquanto a reivindicação exige selecionar entre dois tipos de unidades de camada de abstração de rede (NAL) dependendo se a imagem IDR tem uma imagem principal subsequente ou não tem uma imagem de liderança subsequente, o padrão não contempla essa limitação:

> **Prof. Gustavo Fraidenraich:**
> *"Portanto, no padrão H.265, a limitação 1[c] da reivindicação não é atendida porque, embora uma imagem IDR com uma imagem de liderança subsequente receba o tipo IDR_W_RADL de unidade NAL (ou seja, tipo de unidade de primeira camada), esse tipo de unidade NAL nem sempre "indica que a imagem IDR tem uma imagem principal subsequente". Da mesma forma, a limitação 1[d] da reivindicação não é atendida porque, quando a imagem IDR não tem uma imagem de liderança subsequente, ela pode obter o tipo IDR_W_RADL ou IDR_N_LP de unidade NAL, de modo que o "segundo tipo de unidade NAL" reivindicado nem sempre é diferente do "primeiro tipo de unidade NAL" reivindicado."*

142. Esclarece ainda o Prof. Gustavo Fraidenraich que, em certas implementações do H.265/HEVC, estas limitações da reivindicação também não são reproduzidas por outras razões adicionais:

> **Prof. Gustavo Fraidenraich:**
> *"Além disso, em certas implementações, imagens IDR sempre usam o tipo de unidade NAL IDR_W_RADL. Portanto, nessas implementações, as limitações 1[c] e 1[d] não são atendidas porque o codificador não terá dois tipos de unidades NAL diferentes que dependem de haver ou não uma imagem principal ou de liderança subsequente. Em vez disso, uma imagem IDR sempre usará o tipo de unidade NAL IDR_W_RADL."*

54

**DANNEMANN**
**SIEMSEN**

143.   Sendo assim, a tecnologia reivindicada na patente BR112014025292-0 não encontra correspondência no padrão H.265/HEVC.

## V.4 – A FRAGILIDADE DO PORTFÓLIO DE PATENTES DA VELOS EM NEGOCIAÇÃO ENTRE AS PARTES.

144.   No contexto do demonstrado no capítulo anterior, que visa a comprovar que a declaração de essencialidade assinada pela VELOS, e suas antecessoras, de fato, não é prova alguma de essencialidade de suas patentes aos respectivos padrões, cabe ressaltar a fragilidade do portfólio de patentes da VELOS alegadamente essenciais a padrões, como o HEVC.

145.   De fato, como já visto acima, as SSOs, como a ITU, que promulgou o padrão HEVC, não realizam uma verificação acerca do mérito da declaração de essencialidade. Apenas recebem e arquivam as declarações assinadas pelos titulares que, munidos dessas declarações, passam a negociar seus portfólios argumentando possuírem patentes valiosas, já que seriam essenciais aos padrões adotados pela indústria, necessários a todos os implementadores de tecnologias. Ocorre que, na realidade, essas declarações, desprovidas de uma chancela das SSOs sobre a verdadeira essencialidade das patentes, nada mais são do que o compromisso expresso e assinado pelo titular de que irá licenciar sua patente em termos FRAND.

146.   Essa é a contrapartida da declaração de essencialidade, como visto acima nos textos gravados no corpo das próprias declarações. Essa contrapartida serve para evitar abusos de direito e equilibrar o mercado, já que os titulares obtêm grande vantagem ao declararem suas patentes como essenciais. Essa vantagem deriva do fato de que uma patente essencial será necessária para que todos os implementadores da indústria ofereçam seus produtos e serviços de acordo com o respectivo padrão.

**DANNEMANN
SIEMSEN**

147.    Ou seja, o titular de uma patente essencial tem uma enorme vantagem econômica que é uma ampla gama de interessados em obter o licenciamento. A contrapartida da declaração de essencialidade, que é o compromisso com o licenciamento em termos FRAND, vem para impedir comportamentos abusivos e excludentes, que tornariam o padrão impraticável, perdendo sentido amplo para o qual os padrões foram criados.

148.    A análise da essencialidade de cada patente declarada como essencial acaba sendo realizada no curso de ações judiciais, quando as partes e um perito técnico estudam a tecnologia reivindicada e a comparam com o texto técnico do respectivo padrão ao qual a patente foi declarada como essencial. Apenas após essa extensa análise técnica, altamente complexa, podem as partes aferir se a patente é de fato essencial ou não.

149.    Nesse contexto, o breve estudo técnico demonstrado acima já traz fortes indícios de que algumas das patentes que a VELOS declarou como essenciais, na realidade, não o são. Isso reduz significativamente a relevância do portfólio da VELOS ora negociado com a BYTEDANCE e, por consequência, seu real valor de mercado.

### **CONCLUSÃO E PEDIDOS**.

Pelo exposto, a BYTEDANCE requer a citação da Rés **VELOS MEDIA INTERNATIONAL LIMITED**, **VELOS MEDIA LLC** e **TECHSTREAM LLC** seja feita no endereço do representante legal no Brasil da **VELOS MEDIA INTERNATIONAL LIMITED**, o escritório DANIEL ADVOGADOS, na Rua Leopoldo Couto Magalhães Júnior, 758, 5º andar, Conjunto 52 (Edifício New Century), Itaim Bibi, CEP 04542-000, na Cidade de São Paulo, Estado de São Paulo, e endereços eletrônicos law@daniel.com.br e patents@daniel-ip.com, que possui poderes específicos para receber citação em assuntos relacionados a Propriedade Industrial, conforme instrumento de mandato arquivado junto ao INPI nos processos administrativos das patentes BR112014011334-3, BR112014025292-0, PI 0813904-0 e BR122019021946-0 que compõem o objeto desta ação (vide **Doc. 10**), na forma do artigo 217 da LPI.

**DANNEMANN**
**SIEMSEN**

No mérito, as Autoras requerem a V.Exa. seja a demanda julgada **INTEGRALMENTE PROCEDENTE** para:

(i) **Pedido Principal** – Declaração de não essencialidade e não infração:

Que se declare que apesar de a VELOS alegar que as patentes BR122019021946-0, BR102012027259-8, BR102012027968-1, PI0813904-0, BR102013001517-2, BR102013001124-0, BR112013007383-7, BR102012029413-3, BR112014011334-3 e BR112014025292-0 seriam essenciais a um ou mais padrões estabelecidos pelo ITU-T, incluindo o padrão H.265/HEVC – portanto, contraindo obrigações FRAND –, não são de fato essenciais a qualquer desses padrões, e que não há infração dessas patentes pelo uso dos respectivos padrões, seja pela BYTENDANCE ou seus parceiros comerciais, em qualquer de seus produtos e serviços, incluindo mas não se limitando à plataforma TikTok, devendo a VELOS ser condenada a se abster de tomar quaisquer medidas inibitórias/excludentes, de qualquer natureza, contra a BYTEDANCE e seus parceiros comerciais. Na medida em que funcionalidades relevantes do H.266/VVC são implementadas substancialmente da mesma forma que o padrão H.265/HEVC, quaisquer patentes que não sejam essenciais ao H.265/HEVC também não o serão ao H.266/VVC, substancialmente pelas razões acima expostas.

(ii) **Pedido subsidiário –** Declaração de obrigação de licença limitada e condicional:

Subsidiariamente, e somente na medida em que V. Exa. entenda que qualquer das patentes discutidas seria de fato essencial para o padrão H.265/HEVC (ou ao padrão relacionado H.266/VVC), que se declare que a VELOS deve conceder uma licença dessas patentes à BYTEDANCE (o que engloba seus parceiros comerciais) em termos FRAND, ao invés de buscar medidas inibitórias abusivas através de ações judiciais em violação ao seu compromisso FRAND, incluindo ações que reivindiquem patentes não essenciais mas que já estão abrangidas nas negociações atualmente em curso entre as partes para o licenciamento do portfólio da VELOS, devendo, por consequência, nos termos dos artigos 497 e seguintes do Código de Processo Civil, ser condenada a conceder as referidas licenças em termos FRAND para as respectivas patentes vigentes em território nacional e com amplitude sobre o território brasileiro.

(iii) **Pedido autônomo** – Declaração de conduta abusiva pela falha em negociar em termos FRAND:

Por fim, que se declare que a adoção pela VELOS de medidas, extrajudiciais ou judiciais, inibitórias e excludentes do uso de suas patentes alegadamente

dannemann.com.br

**DANNEMANN**
**SIEMSEN**

essenciais ao padrão de codificação de vídeo H.265/HEVC, ou outro padrão relacionado subsequente, sem antes se envolver em discussões razoáveis, extrajudiciais ou judiciais, acerca do valor dos *royalties* de licenciamento em termos FRAND, constitui ato abusivo e contrário à boa-fé objetiva e ao ordenamento pátrio, que não pode ser tolerado ou dotado de qualquer eficácia, devendo, em consequência, nos termos dos artigos 497 e seguintes do Código de Processo Civil, a VELOS ser condenada a abster-se de tomar medidas inibitórias/excludentes, de qualquer natureza, nessas condições contra a BYTEDANCE e seus parceiros comerciais.

Ademais, as Autoras requerem a condenação da Ré ao pagamento das custas processuais e dos honorários advocatícios, a serem arbitrados por esse Juízo, na formado art. 85, §2º, do CPC.

Requer-se ainda que todas as intimações referentes ao presente processo sejam feitas exclusivamente, sob pena de nulidade, em nome do advogado RODRIGO DE ASSIS TORRES (OAB/RJ – 121.429), sob pena de nulidade.

As Autoras protestam pela produção de todos os meios de prova admitidos em direito, especialmente documental suplementar e pericial.

Ainda, requerem a juntada posterior das traduções juramentadas dos instrumentos de mandato da 1ª, 2ª e 3ª Autoras outorgando poderes aos seus patronos e de duas declarações que compõem o doc. 06, para cumprimento do artigo 192, § único, do CPC.

Atribui-se à causa o valor de R$ 300.000,00, para fins meramente fiscais.

Nestes termos,
Pedem deferimento.

Rio de Janeiro, 18 de dezembro de 2025.


Eduardo G. Camara Junior
OAB/RJ – 125.140

Joaquim Eugênio Goulart
OAB/RJ – 85.629

Natália Barzilai
OAB/RJ – 160.275

Rodrigo de Assis Torres
OAB/RJ – 121.429

dannemann.com.br

Ronaldo Stoffel
OAB/RJ – 199.704

Juliana Coelho
OAB/RJ – 220.769

Fabiano Gonzaga
OAB/RJ – 235.240

Ana Luiza Brito
OAB/RJ – 249.975

J054433 – FLM/RFF/AHN/RAT/EDU/

59



## LISTA DE DOCUMENTOS

**Doc. 01**     Procuração das Autoras.

**Doc. 02**     Documentação que comprova o endereço das Rés.

**Doc. 03**     Ação ajuizada pela VELOS em face da BYTEDANCE nos Estados Unidos.

**Doc. 04**     Resposta da BYTEDANCE na supramencionada ação ajuizada pela VELOS em face da BYTEDANCE nos Estados Unidos

**Doc. 05**     Declaração de Essencialidade das Patentes feita pela VELOS MEDIA perante o ITU-T

**Doc. 06**     Declarações de Essencialidade das Patentes feita pelas titulares antecessoras RESEARCH IN MOTION, BLACKBERRY e SHARP

**Doc. 07**     Decisão do CADE nos autos do Recurso Voluntário nº 08700.010219/2024-17

**Doc. 08**     Decisão proferida pela Corte do Reino Unido relativa à implementação do compromisso FRAND

**Doc. 09**     Nota Técnica de Não Infração elaborada pelo Prof. Gustavo Fraidenraich

**Doc. 10**     Procuração da VELOS perante o INPI